**Thomas F. DOOLEY, Plaintiff,**

*v.*

**UNITED TECHNOLOGIES CORP., et al., Defendants.**

**Civ. A. No. 91–2499.**

United States District Court, District of Columbia.

Oct. 1, 1992.

---

Michael J. Madigan, Robertson T. Park, Michael J. Mueller, Akin, Gump, Hauer & Feld, Kenneth Michael Robinson, Cooter & Gell, Washington, D.C., for plaintiff.

William D. Iverson, Deborah A. Garza, Jeffrey B. Coopersmith, Covington & Burling, Washington, D.C., for defendants, United Technologies Corp., United Technologies Holding Corp., United Technologies International Operations, Inc. (UTIO), Sikorsky Aircraft, Sikorsky Aircraft, Saudi Arabia, Sikorsky International Products, Inc. (SIPI), Eugene Buckley, Robert F.

Daniell, Joseph Homza, William F. Paul, Clement Charles Peterson, Robert Zincone.

John D. Aldock, Laura S. Wertheimer, Shea & Gardner, Washington, D.C., for defendants Olin E. Smith, Olin E. Smith & Associates, Inc.

Thomas F. Cullen, Jr., Christopher F. Dugan, Jones, Day, Reavis & Pogue, Washington, D.C., for defendant, Westland Inc.

## OPINION

JUNE L. GREEN, District Judge.

The plaintiff, Thomas Dooley, has brought an action against numerous defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act, Title 18, United States Code, sections 1961 *et seq.* ("RICO"), and supplemental state law claims. The motions presently before the Court include the motion of defendants Westland Group plc and Westland Helicopters, Ltd. to dismiss the complaint and the motion of defendants Ibrahim A. Al Namlah. Thimar Al–Jazirah Corporation, and Thimar Aviation Supply Company to dismiss the complaint. For the reasons set forth below, the Court denies both motions to dismiss.

## FACTS

The Complaint alleges the defendants' involvement in a wide-ranging conspiracy encompassing foreign and domestic corporations, individuals and governments. The conspiracy allegedly involves a bribery scheme between representatives of the Saudi Arabian Government and Dooley's employer, defendant Sikorsky, along with Sikorsky's parent corporation, United Technologies Corporation ("UTC"), and various co-conspirators including the two British defendants and the three Saudi Arabian defendants whose motions are before the Court.

UTC/Sikorsky[1] manufactures and sells military and commercial helicopters. Dooley alleges that throughout the late 1970's UTC/Sikorsky actively solicited the Saudi Arabian government as a customer for its helicopters. Dooley further alleges that in 1986, the Saudi Arabian Ministry of Defense and Aviation ("MODA") finally agreed to purchase UTC/Sikorsky helicopters. Dooley claims that to obtain the Saudi's business, UTC/Sikorsky agreed to pay substantial bribes to Saudi Arabian officials and businessmen.

The international players in the alleged conspiracy can be divided into two groups. The "British defendants" include Westland Group plc and Westland Helicopters, Ltd., two British corporations which manufacture and sell helicopters. The "Saudi defendants" include Ibrahim A. Al Namlah ("Namlah"), a Saudi Arabian citizen and businessman, and Thimar Al–Jazirah Corporation ("TAJC") and Thimar Aviation Supply Company ("TASC"), two closely held businesses owned by Namlah.

## THE SAUDI DEFENDANTS

The conspiracy allegedly developed through agreement between high-level UTC/Sikorsky employees, and defendant Namlah. Namlah allegedly was designated by the Saudi Arabian Ambassador to the United States, His Royal Highness ("HRH") Prince Bandar bin Sultan ("Prince Bandar"), to be UTC/Sikorsky's business "contact" in Saudi Arabia. Namlah, is President and sole owner of Thimar Al–Jazirah Corporation and Thimar Aviation Supply Company. According to the plaintiff, Namlah came to the United States in January 1986 to meet with defendant Zincone, the former President of Sikorsky. Plaintiff Dooley, who also was present at the meeting, alleges that Namlah presented a letter from HRH Prince Sultan bin Abdul Aziz bin Saud ("Prince Sultan"), the Saudi Arabian Minister of Defense and Aviation (and Prince Bandar's father), which stated that Prince Sultan had no objection to Sikorsky entering into a business relationship with Namlah. The plaintiff also alleges that Prince Bandar indicated that UTC/Sikorsky should become joint venture partners with Namlah and his corporation, Thimar Al–Jazirah Corp., before sales of

1. The Court refers to defendant UTC and defendant Sikorsky collectively, as one entity, throughout this Memorandum to simplify the discussion.

Black Hawks to Saudi Arabia could proceed. Thereafter, Dooley alleges, Namlah became UTC/Sikorsky's point man in the bribery schemes.

The scheme described by the plaintiff involved the sale of 12 UTC-manufactured Black Hawk helicopters to MODA through the Foreign Military Sales ("FMS–Black Hawks") program, administered by the Department of Defense, and implicit promises for future sales. In exchange for the sales, UTC allegedly agreed to pay bribes to HRH Prince Khalid bin Sultan ("Khalid") and HRH Prince Fahad bin Sultan ("Fahad"), also sons of Prince Sultan, through Namlah.

Plaintiff Dooley alleges that from 1986 through May of 1987, Namlah negotiated the proposed joint venture with UTC/Sikorsky. According to the plaintiff, the proposed joint venture was to be called, Sikorsky Aircraft Saudi Arabia, Ltd. ("SASAL"). SASAL's legitimate purpose was to provide maintenance work on the FMS–Black Hawks. But, according to the plaintiff, it also would serve as a mechanism for passing the bribes. Namlah allegedly made demands for his "bonus" during the SASAL negotiations. Plaintiff Dooley contends that the final joint venture proposal, which was signed by Namlah, provided for a 55/45 split of profits in Namlah's favor. He further contends that Namlah was not required to perform any real work to obtain his share. It is alleged that SASAL was abandoned when it became too visible to United States Government oversight.

Plaintiff Dooley alleges that when Namlah and the UTC defendants abandoned SASAL, they determined to involve a third party as Namlah's joint venture partner. As a result, Namlah formed a joint venture with Frank E. Basil, Inc. of Washington, D.C. ("Basil"). The plan allegedly was to have the Basil/Namlah joint venture perform personnel support services ("PSS") in conjunction with the maintenance support service ("MSS") contracts. The bribes would be added into the PSS contract costs. Plaintiff Dooley contends that Namlah told him that defendant Buckley, President of Sikorsky, approved the joint venture and

Namlah's bonus during Namlah's visit to Sikorsky's Connecticut office in June 1988.

The plaintiff alleges that the Basil/Namlah bribery mechanism also was abandoned when the Saudi Arabian Government refused to register the joint venture. Basil's interest in the venture allegedly was assigned to Thimar Al–Jazirah Corporation. In the end, according to the plaintiff, a subsidiary of defendant UTC—defendant Sikorsky International Products, Inc. (SIPI)—was contracted to provide the MSS; a line-item in SIPI's MSS contract gave TAJC the PSS contract. Dooley contends that Namlah took his "bonus" and the bribes for Prince Bandar's brothers from this contract. The actual performance under the contract allegedly was subcontracted to Basil.

Dooley alleges that Namlah also entered into other agreements with UTC defendants relating to the MSS and PSS work to enlarge his share of the bribes. Dooley contends that Namlah created TASC solely for this purpose.

BRITISH DEFENDANTS

According to Dooley, the alliance between the British defendants and defendants UTC/Sikorsky began in December 1985, when UTC agreed to purchase a significant financial interest in Westland Group plc. Westland Group plc allegedly controls 100 percent of the capital of Westland Helicopters, Ltd. and Westland, Inc., so UTC also became associated with these companies. The two companies then entered into a manufacturing license agreement, on March 7, 1986, giving the British defendants the right to manufacture UTC/Sikorsky's Black Hawk helicopter.

Dooley alleges that the Saudis were primarily interested in purchasing armed Black Hawks. Because Congress would not approve such a sale, the defendants allegedly devised one scheme to arm the 12 FMS–Black Hawks through the Westland defendants, and another to sell fully armed Black Hawks to Saudi Arabia directly through the British defendants. Dooley alleges that in order to accomplish their schemes, the defendants, including the British defendants, sought an amendment

to the UTC–Westland licensing agreement ("Amendment 4") to permit direct sales by the British defendants to Saudi Arabia without congressional approval. Amendment 4 was approved by the Department of State in January or February of 1988. Dooley alleges that none of the defendants informed the State Department, Department of Defense or Congress of their design to arm the Black Hawks.

Dooley further alleges that through a separate bribery scheme the British defendants have obtained the Saudi Government's promise to purchase 88 armed Black Hawks. The sale is to be part of the Al–Yamanah II ("AY–II") transaction which the United Kingdom Ministry of Defense and the Saudi Arabia MODA announced on July 9, 1988. Dooley alleges that in order to obtain this sale, the British defendants entered into their own joint venture agreement with defendant Namlah, to create a mechanism for bribes for Prince Sultan's sons.

## ANALYSIS

Both the British defendants and the Saudi defendants challenge this Court's jurisdiction and challenge the sufficiency of plaintiff Dooley's Complaint to state a claim against them. Many of the arguments made by both sets of defendants are duplicative. The Court, first, will consider whether personal jurisdiction exists over the defendants individually and then take up the arguments made by both the Saudi and British defendants.

### I. Personal Jurisdiction

A. *Service of Process Is Based On The District Of Columbia Long–Arm Statute.*

Before a federal court may exercise personal jurisdiction over a foreign defendant in litigation involving a federal question, there must be some basis for the defendant's amenability to service. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987). In *Omni*, the Supreme Court found that personal jurisdiction was lacking where neither the federal statute under which the claim was made, nor the state long-arm statute authorized service on the foreign defendants. *Id.*

■ Although RICO authorizes nationwide service of process, it does not provide for service of process in a foreign country. *Avianca, Inc. v. Corriea*, 705 F.Supp. 666, 584 (D.D.C.1989). In order for this Court to exercise personal jurisdiction over the British defendants, service of process must be authorized under the District of Columbia long-arm statute.

Plaintiff Dooley relies upon the "transacting business" section found in District of Columbia Code, section 13–423(a)(1). Under section 13–423(a)(1), a court has personal jurisdiction over an individual if the individual transacted any business within the district, the claim arose out of the jurisdictional contacts and the exercise of personal jurisdiction does not offend due process. Section 13–423(a)(1), has been construed broadly by courts. As the section states, any transaction, even a single transaction, will suffice if it gives rise to the plaintiff's cause of action.

■ When a claim is related to or arises out of a defendant's contacts with the forum, a court is said to be exercising specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). The Supreme Court has explained that "a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of [specific] jurisdiction." *Id.*, quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977).[2]

---

**2.** In *Helicopteros Nacionales,* the Court reversed the Texas Supreme Court's finding of personal jurisdiction over a foreign corporation because it violated the Fourteenth Amendment Due Process Clause. The corporation's only significant contacts with Texas had been one trip to Houston by its chief executive officer to negotiate a contract to be performed outside the forum, the corporation's acceptance of checks drawn on a Texas bank, the purchase of helicopters and related equipment and services from Texas, and training sessions for company personnel in Texas. The parties conceded that the petitioner's claims neither arose from nor were related to

But the relationship between the defendant, the litigation and the forum also must satisfy due process requirements. "[T]he constitutional touchstone [of Fourteenth Amendment due process analysis] remains whether the defendant purposely established 'minimum contacts' in the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *see also, Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 108, 107 S.Ct. 1026, 1030, 94 L.Ed.2d 92 (1987). "Minimum contacts" entail "some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183.

■ Plaintiff Dooley argues that in assessing an alien defendant's contacts under a state long-arm statute in a federal question litigation, a court should consider the alien's nationwide contacts, not simply contacts with the forum state. This view springs from the belief that the Fifth Amendment due process clause governs the exercise of personal jurisdiction in such cases.

The Fifth Amendment due process clause, however, is not controlling. Because the federal statute (RICO) at issue does not provide for service of process on these defendants in a foreign country, au-thorization for service depends upon the state law. And, because state law is subject to Fourteenth Amendment limitations, minimum contacts with the forum state must be established. *United Elec. Workers v. 163 Pleasant Street Corp.*, 960 F.2d 1080 (1st Cir.1992).

Applying these principles, the Court first considers whether jurisdiction is proper over the British defendants and then the Saudi defendants.[3]

### B. The British Defendants.

#### 1. Government Contacts

■ Plaintiff Dooley alleges that the British defendants transacted business in the District of Columbia and that these contacts are sufficient to satisfy due process. The British defendants argue that their direct contacts with the District of Columbia cannot be included in the jurisdictional calculus because they fall within the government contacts exception.

■ The government contacts exception precludes the assertion of personal jurisdiction over a non-resident whose only contacts with the District of Columbia are for purposes of dealing with a federal agency or Congress.[4] The exception stems from the District of Columbia's unique character as home of the Federal Government and the need for unfettered access to the instrumentalities of the Federal Government. *Chase v. Pan–Pacific Broad-*

the respondent's activities in Texas. The Court found these contacts insufficient to meet due process requirements for the assertion of general jurisdiction. The Court specifically noted, however, that it was not deciding the question of whether similar contacts were sufficient to meet the due process requirement for specific jurisdiction, i.e., where the cause of action arose out of the contacts.

Here, Dooley is claiming the Court has specific jurisdiction over the British defendants. The Supreme Court's determination in *Helicopteros Nacionales*, therefore, is not controlling.

3. Because the Court finds personal jurisdiction over the British and Saudi defendants exists under the District of Columbia long-arm statute based on minimum contacts, it need not consider whether in the absence of minimum contacts, personal jurisdiction may be asserted under a

conspiracy theory. In such analysis, however, the Court would have to consider the alien status of the defendants, the affect of international law, and the Supreme Court's admonishment that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 115, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92 (1987), quoting *United States v. First National City Bank*, 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting).

4. Plaintiff Dooley's assertion that the government contacts exception does not apply to alien corporations is erroneous. *See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty., Ltd.*, 647 F.2d 200, 205 n. 11 (D.C.Cir.1981) (applying government contacts exception to Australian wine companies).

*casting, Inc.*, 617 F.Supp. 1414, 1425 (D.D.C.1985). The British defendants maintain that because all their contacts with this jurisdiction were intended to facilitate government approval of the licensing amendment, they fall under the government contacts exception.

Based on the contacts alleged by plaintiff Dooley, the Court is not convinced that the British defendants visited Washington, D.C. to gain access to the instrumentalities of the Federal Government. They did not come here to meet with government officials or lobby Congress or file documents with government agencies,[5] or the like. Rather, they came to the District to meet with business associates and legal advisers to discuss problems and options concerning the Black Hawk sales program. *See e.g.*, Letter to Hugh P. Stewart, (Chief Executive Westland Group plc) from C. Richard Bergwin, (Director, Export License Administration, UTC), dated August 17, 1987, attached as Exhibit 14 to Dooley's Westland Opposition. The fact that the parties may have discussed Amendment 4 and its continued viability, as well as other options, does not change the character of these business meetings to government contacts.

### 2. Personal Jurisdiction Exists Over British Defendants Under § 13–423(a)(1).

■ The remaining question is whether these alleged contacts with the District of Columbia are sufficient to subject the British defendants to jurisdiction here.

In sum, the relevant allegations concerning the British defendants' contacts with the District of Columbia involve two business meetings, in 1987, attended by Hugh P. Stewart, Chief Executive Officer of Westland Group plc and Chairman of Westland Helicopters, Ltd., and other representatives of the British defendants, at which strategy for expanding the British defendants' licensed sales territory, including Amendment 4, was discussed; two business meetings, in 1988, concerning certain sales aspects of the Black Hawk program; at least one other business meeting attended by a representative of Westland Group plc; a number of letters, phone calls and telefaxes regarding the Black Hawk program; and the presence of Washington, D.C. counsel, who, allegedly acted as an agent of the British defendants in business meetings and communications.

In conducting business meetings in the District; sending and receiving mail, telefaxes, and phone calls to and from the District and holding out Washington, D.C.-based counsel as its representative in business matters, it is clear that the British defendants were transacting business in the District of Columbia. Moreover, Dooley's claims against the British defendants relate to their activities within the forum. Dooley's RICO claims against the British defendants stem from their alleged participation in a global enterprise engaged in racketeering. Dooley alleges that the British defendants' role was pivotal in providing armed Black Hawks to Saudi Arabia. Amendment 4, according to Dooley, enabled the conspirators to arm the helicopters purchased by the Saudis without prior approval by Congress or the United States Government. If Dooley's allegations and supporting evidence are believed, as they must be for purposes of deciding the motion to dismiss, many of the key decisions and activities surrounding the pursuit and approval of Amendment 4 took place in the District of Columbia. These actions, Dooley alleges, were integral to the racketeering conspiracy which he opposed and which gave rise to his claim.

---

**5.** Plaintiff Dooley also maintains that the British defendants' role in the filing of Amendment 4 subjects them to jurisdiction here. However, any such alleged contact would fall squarely under the government contacts exception. The Court, therefore, excludes this allegation from its analysis of the question of personal jurisdiction over the British defendants.

Because the Court finds that in any event, the filing of Amendment 4 falls under the government contacts exception, it does not reach the collateral issues raised by the parties: (1) whether the British defendants can be said to have participated in the filing of Amendment 4, which by law must be filed by an American entity; and (2) whether the OMC, the situs of the filing, is located for jurisdictional purposes at its official address in the District of Columbia or at its physical location in Rosslyn, Virginia.

■ The Court further concludes that these contacts satisfy due process. Dooley alleges that the British defendants deliberately entered the forum both in person and through their various communications with alleged co-conspirators to plan and carry out acts crucial to the success of the conspiracy. It is fair and reasonable that these defendants be called back into this forum to defend against claims foreseeably stemming from their actions here. Moreover, the plaintiff has a substantial interest in pursuing his claims against all the defendants in one forum. The Court has ruled previously that Dooley's claims against all other remaining defendants can proceed in the District of Columbia. The forum, too, has an interest in preventing fraud on the Government and the involvement of its residents in the type of international conspiracy alleged by Dooley. Consequently, any burden imposed upon the British defendants is justified by the countervailing interests of the plaintiff, the forum and by their own acts establishing minimum contacts with the District of Columbia.

### C. The Saudi Defendants.

■ Plaintiff Dooley contends that he also has made a *prima facie* showing of personal jurisdiction over the Saudi defendants. The plaintiff alleges that Namlah and his two wholly owned corporations came to Washington, D.C., on several occasions, to discuss business related to the conspiracy with Saudi Arabian Ambassador Prince Bandar. He further alleges that a Washington, D.C.-based lawyer, Mr. Christopher J. Narborough, negotiated the SASAL joint venture, from the District of Columbia, on behalf of the Saudi defendants. Finally, plaintiff Dooley alleges that the Saudi defendants subjected themselves to personal jurisdiction in the District of Columbia by entering into a joint venture and supplemental cooperation agreement and later a sub-contracting agreement with a Washington, D.C.-based corporation, Frank E. Basil, Inc. ("Basil").

In response, the Saudi defendants contend that none of these alleged contacts is sufficient to subject them to personal jurisdiction here. The Saudi defendants dispute the plaintiff's allegations concerning the alleged contacts with Prince Bandar. They also dispute the plaintiff's allegation concerning the negotiation of SASAL and Mr. Narborough's involvement. Furthermore, the Saudi defendants contend that the Basil joint venture and subsequent contracts, are insufficient contacts to support a finding of personal jurisdiction. They point out that the Supreme Court, in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), rejected the argument that merely contracting with a company residing in the forum subjects a party to personal jurisdiction therein. The Saudi defendants contend that because the contracts were negotiated, executed and performed outside the District, the assertion of personal jurisdiction over them based on these contracts would be improper.

The Court in *Burger King* reiterated that "minimum contacts" is the constitutional touchstone of personal jurisdiction. *Id.* at 474, 105 S.Ct. at 2183. But the Court rejected a mechanical test to determine if a defendant had established minimum contacts. *Id.* at 478, 105 S.Ct. at 2185. Thus, the Court concluded that a contract alone does not establish minimum contacts automatically. Rather, the Court stated that, in determining whether the contracting defendant purposefully availed itself of doing business within the forum, the focus must be on factors such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479, 105 S.Ct. at 2185.

Examination of these factors as they relate to the Saudi defendants' contracts with Basil, suggests, on the surface, that the Saudi defendants lack minimum contacts with the forum. Both contracts appear to have been negotiated by Namlah from outside the District of Columbia.[6] The con-

---

**6.** In making this finding, the Court does not ignore plaintiff Dooley's contention, not directly disputed by Namlah, that Namlah communicat-

ed by mail and by wire with Basil in the District during the negotiations. This Court previously has recognized the significance of such business

tracts contemplate performance in Saudi Arabia. And the record, though minimally developed, does not reveal a course of dealing among the parties which creates significant contacts with the forum.[7] But a more penetrating look at the Saudi defendants' purposes in dealing with Basil is necessary.

The Saudi defendants purposefully entered into two separate business arrangements with Basil: the joint venture in existence from November 4, 1988 until October 1, 1989, and the service contract entered into in December 1991. Dooley alleges that the Saudi defendants, in conspiracy with others, selected Basil as a front for their bribery scheme. Basil was to perform the actual work under the contracts. Payoffs to the Saudi defendants and Saudi royalty, Dooley alleges, were to be passed through the financial dealings of these business arrangements. Thus, according to the plaintiff, Basil became necessary to the success of the racketeering conspiracy.[8]

Viewed in this light, the Saudi defendants' alleged actions are sufficient to establish minimum contacts.[9] The Saudi defendants purposefully availed themselves of the forum by deliberately bringing Basil into the international racketeering conspiracy. They obtained the benefits of an affiliation with a legitimate Washington, D.C.-based business. And their actions, in part, caused Basil to become embroiled in the current litigation. It is not unreasonable for the Saudi defendants to be called to defend themselves on an action which relates to the conspiracy that they successfully fostered in this forum.

## II. Dooley Has Stated A Claim Under RICO Against The British and Saudi Defendants

Both the British and Saudi defendants challenge the sufficiency of Dooley's RICO pleadings as to them. They argue that Dooley has established neither a pattern of related and continuous predicate acts that pose a threat of continued criminal activity, nor any individual predicate acts committed by the British or the Saudi defendants.

This Court has ruled previously that the plaintiff has sufficiently alleged both the existence of a RICO enterprise and a pattern of racketeering activity as to other defendants. Opinion (filed June 17, 1992). Under RICO, liability extends to any person who participates in the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c). A pattern of racketeering activity requires at least two predicate acts of racketeering. *H.J. Inc. v. Northwestern Bell Tel. Co.,*

communications in assessing a defendant's forum contacts.

7. Thus far, the parties have engaged in minimal discovery. Further discovery may reveal other connections between the Saudi defendants and Basil or others in this forum.

8. This analysis does not change if Basil was an unwitting party to the conspiracy. The Court, previously dismissed Dooley's claim against Basil because it failed to state a claim that Basil had intentionally committed acts of racketeering or purposefully joined in a racketeering conspiracy. *See* Opinion, (filed June 17, 1992) at 6–8. However, Dooley's failure to allege that Basil intentionally joined in the bribery scheme, does not affect the sufficiency of his allegations regarding the Saudi defendants' designs for Basil.

9. The conclusion that the Saudi defendants established minimum contacts with Washington, D.C. is bolstered by Dooley's allegations that the Saudi defendants frequently had contact with

Ambassador Bandar here. Although in a declaration submitted with his motion, defendant Namlah denies that he had contacts with Ambassador Bandar in the District of Columbia or elsewhere, concerning the subject matter of Dooley's complaint, there is evidence in the record which contradicts the defendant's denial. Under such circumstances, the Court must construe the facts liberally for the plaintiff. *See District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1082 n. 16 (D.C.Cir.1984).

In contrast, however, the Court does not find the contact by attorney Christopher Narborough jurisdictionally significant. The defendants have submitted an affidavit which shows that Mr. Narborough, an associate in a London law firm where defendant Namlah is a client, was never Mr. Namlah's Washington attorney; that while he worked on the joint venture documents, he never had authority to negotiate any agreement; and that Mr. Narborough had no known contacts with anyone regarding the joint venture negotiations during his temporary stay in Washington, D.C. Nothing in the record contradicts these statements.

492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). Thus, the plaintiff must allege that the British defendants and Saudi defendants, individually committed at least two predicate acts of racketeering to state a RICO claim against them. *R.E. Davis Chemical Corp. v. Nalco Chemical Co.*, 757 F.Supp. 1499, 1509 (N.D.Ill.1990).

Dooley claims he has met this pleading requirement fully by describing six separate offenses committed by these defendants, which constitute predicate acts under RICO. These include violations of (1) the Travel and Foreign Corrupt Practices Acts; (2) the witness tampering statute; (3) the obstruction of justice statute; (4) mail fraud; (5) wire fraud; (6) the Money Laundering Control and Arms Export Control Acts.

The Court determines, for reasons which follow, that plaintiff Dooley cannot state a RICO claim against the British defendants based on the Travel and Foreign Corrupt Practices Acts. Nor can the plaintiff's RICO claims against either the British or Saudi defendants be based on violations of the witness tampering or obstruction of justice statutes. Despite these deficiencies, however, the Court finds that the plaintiff has alleged sufficiently that the British and Saudi defendants engaged in various predicated acts, and thus, participated in a RICO enterprise through a pattern of racketeering. Consequently, the Court finds Dooley's RICO counts sufficient to state a claim against the British defendants and against the Saudi defendant.

A. *The Travel Act and Subject Matter Jurisdiction Under the Foreign Corrupt Practices Act.*

The Travel Act, one of the enumerated predicate acts of racketeering under RICO, prohibits travel with the intent to promote "unlawful activity". 18 U.S.C. § 1952(a). Under the Act, "unlawful activity" includes bribery in violation of the laws of the United States. 18 U.S.C. § 1952(b). Dooley charges that the British and Saudi defendants committed Travel Act violations because their actions violate the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, sections 78dd–1, 78dd–2. The FCPA prohibits the use of the mails or any instrumentality of interstate commerce to offer or pay bribes to foreign officials in order to obtain or retain business. Thus, the success of plaintiff Dooley's RICO-related claim that the British and Saudi defendants committed Travel Act violations, hinges on whether these defendants violated the FCPA.

The prohibitions of the FCPA apply to any "issuer" or "domestic concern", as defined by the Act,[10] and also to "any officer, director, employee, or agent of such [issuer or] domestic concern or any stockholder thereof acting on behalf of such [issuer or] domestic concern...." 15 U.S.C. § 78dd–2(a). Neither the Saudi defendants, nor the British defendants, come under the Act's prohibitions as to an issuer or a domestic concern. However, the plaintiff asserts that these defendants' actions were prohibited by the provision which applies to agents and stockholders.[11]

In response, both the British defendants and the Saudi defendants contend that Congress excluded foreigners from the reach of the FCPA and, therefore, this Court has no subject matter jurisdiction over the allegations against them.

In determining whether the Congress intended to extend the prohibitions of the

---

**10.** The Act defines a "domestic concern" as:

(A) any individual who is a citizen, national, or resident of the United States; and

(B) any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States.

15 U.S.C. § 78dd–2(a).

**11.** Dooley alleges that the British defendants and the Saudi defendants acted as agents for a domestic concern or issuer, namely one of the UTC defendants. Dooley also alleges that the stockholder provision applies to the British defendants because they are stockholders of their American subsidiary, Westland, Inc.

FCPA to foreign corporations and individuals, through an agency relationship, the Court starts from the precept that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States ..." *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). The Act, by its terms does not expressly cover foreign nationals or corporations. The only statutory language which suggests an intent to include certain foreign nationals is found in the penalty provision of the Act. This provision states:

> Any employee or agent of a domestic concern who is a United States citizen, national, or resident or is otherwise subject to the jurisdiction of the United States ... and who willfully violates subsection (a) ... shall be fined ...

15 U.S.C. § 78dd–2(g)(2)(B) (emphasis added).

Referring to this language, the Conference Report explains:

> [T]he conferees determined that foreign nationals or residents otherwise under the jurisdiction of the United States would be covered by the bill in circumstances where an issuer or domestic concern engaged in conduct proscribed by the bill.

H.R.Conf.Rep. No. 831, 95th Cong., 1st Sess. at 14 (1977), U.S.Code Cong. & Admin.News 1977, pp. 4098, 4126.

■ It is clear, therefore, that in certain instances, foreign nationals may be subject to the provisions of the FCPA. However, the British defendants maintain that extraterritorial application of the agency provision is limited to foreign individuals, and hence, does not extend to foreign corporations like Westland Helicopters, Ltd. and Westland Group plc. The Saudi defendants contend that the provision applies only to foreign nationals or residents who are within the United States.

While the language itself is not limiting, the logic of the Conference Report's explanation implies that the Act is limited to foreign individuals who act as agents. The language quoted above is found in the same passage of the Report in which the conferees exclude foreign subsidiaries of United States corporations from coverage under the Act. The Report indicates that:

> [T]he conferees recognized the inherent jurisdictional, enforcement, and diplomatic difficulties raised by the inclusion of foreign subsidiaries of U.S. companies in the direct prohibitions of the bill.

*Id.*

The Report then goes on to state that American parent corporations would remain indirectly liable for violations of the FCPA by a subsidiary. *Id.* It adds that United States individuals (citizens, nationals or residents) could be liable if acting in relation to the affairs of a foreign subsidiary of an issuer or domestic concern. The statement that foreign nationals or residents can be liable in certain circumstances follows.

The logic of these statements implies that the phrase "foreign nationals or residents" was intended to apply only to individuals. If read otherwise, it would extend the FCPA to foreign subsidiaries and nullify their earlier exclusion. Moreover, it is implausible that Congress intended to exclude U.S.-controlled foreign subsidiaries, but not non-subsidiary foreign companies, as plaintiff Dooley suggests. The Conference Report clearly indicates that the authors of the Act were concerned with international comity. The same concerns over diplomatic difficulties and jurisdictional contacts would apply whether a U.S.-owned foreign subsidiary or a foreign corporation was involved.

■ Consequently, the Court lacks subject matter jurisdiction under the FCPA as to the British defendants.[12] And because

---

**12.** Plaintiff Dooley also makes the argument that the British and Saudi defendants agreed to subject matter jurisdiction under the FCPA, in various contracts with other defendants. But parties to litigation cannot consent to confer subject matter jurisdiction upon a federal court.

*Insurance Corporation of Ireland, Ltd., v. Compagnie Des Bauxites De Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). Subject matter jurisdiction is conveyed upon a federal court only by Article III of the United States Constitution or by statutory grant. *Id.*

the British defendants could not have violated the FCPA, they could not have violated the Travel Act.

 However, the Court is not convinced that Congress intended to limit the Act's prohibitions to foreign individuals who are within the United States, as the Saudi defendants suggest. Once a foreign defendant is found to be under the jurisdiction of a United States court, concerns about international comity are limited.[13] Moreover, there may be instances when a foreigner is within the United States and acting as an agent for a domestic concern or issuer, yet not under the jurisdiction of a United States court. For example, if the foreign agent, temporarily in the United States, directs bribery in another state or another country, the agent may be liable under the FCPA but lacks the minimum contacts to support the exercise of jurisdiction. The Saudi defendants' explanation of the Act's provisions is inconsistent with the Conference Report explanation.

Accordingly, the Court concludes that subject matter jurisdiction under the FCPA extends to foreign individuals, over whom the jurisdiction otherwise exists, who act as agents for a domestic concern or issuer. Because it is alleged that Namlah acted as an agent for UTC/Sikorsky and because the Court has personal jurisdiction over this defendant, Dooley may assert his RICO claim against Namlah based on the alleged violation of the FCPA and Travel Acts.

B. *Witness Tampering and Obstruction of Justice.*

 Plaintiff Dooley also alleges that the British and Saudi defendants engaged in racketeering activity by violating the federal witness tampering statute and the federal obstruction of justice statute. However, the plaintiff acknowledges that his Complaint fails to allege any direct

violation of either statute by these defendants. *See* Plaintiff's Opposition to Westland Defendants' Motion, at 41. Plaintiff Dooley argues that the British and Saudi defendants are liable under RICO for these acts because they agreed to the actions of other defendants who retaliated against him.

 To the extent that the plaintiff's argument is that once a RICO cause of action has been stated against a particular defendant, that defendant may be liable for all the actions of the enterprise, he is correct. But Dooley still must allege that each defendant participated in the conduct of an enterprise through a pattern of racketeering activity. At a minimum, Dooley must allege that the individual British and Saudi defendants each committed two RICO predicate acts. *H.J. Inc.*, 492 U.S. at 237, 109 S.Ct. at 2 (1989); *R.E. Davis Chemical Corp.*, 757 F.Supp. at 1509 (N.D.Ill.1990). Dooley cannot meet this requirement by pleading that the British and Saudi defendants agreed to the predicate acts of witness tampering or obstruction of justice committed· by other defendants. *R.E. Davis Chemical Corp.*, 757 F.Supp. at 1509 (N.D.Ill.1990).

C. *Remaining RICO Predicate Act Allegations.*

 Despite all these pleading deficiencies, Dooley has stated a RICO claim against both the British defendants and the Saudi defendants. Dooley's allegations that the British defendants engaged in this pattern of racketeering by committing mail and wire fraud, as well as money laundering violations, in addition to agreeing to the predicate acts of co-conspirators, are sufficient to state a RICO claim and a RICO conspiracy claim against the British defendants. Similarly, allegations against the Saudi defendants that they committed mail and wire fraud, as well as the alleged Trav-

---

In this instance, neither source provides this Court with subject matter jurisdiction over the British defendants under the FCPA.

**13.** The procedural and substantive interests of other nations are factors to be considered in determining whether an extraterritorial exercise

of personal jurisdiction comports with due process. *Asahi*, 480 U.S. at 115, 107 S.Ct. at 1033. It follows, that if a court finds the assertion of jurisdiction is appropriate, international comity concerns must either be minimal or outweighed by other factors.

el Act/FCPA violations discussed above, and agreed to the actions of co-conspirators, are sufficient to establish the plaintiff's RICO claims as to the Saudi defendants.

Both the British defendants and the Saudi defendants challenge the sufficiency of Dooley's fraud pleadings under Civil Rule of Procedure 9(b). The British defendants further challenge the sufficiency of the plaintiff's money laundering allegations against them. None of these challenges defeat the plaintiff's RICO claims.

### 1. Wire and Mail Fraud

To state a RICO claim based upon mail or wire fraud, a plaintiff must allege the existence of a scheme to defraud, defendant's knowing participation in that scheme, and use of interstate mails in furtherance of the scheme. *Griffin v. McNiff,* 744 F.Supp. 1237 (S.D.N.Y.1990). Plaintiff Dooley's Complaint alleges that the British defendants were party to a scheme to defraud the United States Government and Congress. The Complaint further alleges that the defendants, including the British defendants, entered into this scheme to defraud intentionally. The Complaint also contains a general allegation of use of the mails and wires by the various defendants.

On their own, these allegations are not specific enough to meet Federal Rule of Civil Procedure 9(b)'s particularity requirement which applies to counts based in fraud. The Complaint fails to identify specific examples of use of the mails or wires by the British defendants. However, Dooley's general allegations are supported in supplemental papers filed by the parties with specific examples of alleged uses of the mails and wires in furtherance of this scheme. *See* Plaintiff's Opposition to British Motion, Executive Summary of U.S. Contacts—preceding Ex. 14. These examples are sufficient to support Dooley's claim that the British defendants committed the predicate acts of mail and wire fraud.

With respect to the Saudi defendants, the plaintiff alleges they were involved in the bribery scheme to obtain the FMS–Black Hawk sales and the MSS contracts, as well as the scheme to arm the Black Hawks and thereby, defraud the U.S. Government. The Complaint and Dooley's supplemental papers filed with his Opposition to the Saudi defendants' motion to dismiss, are replete with allegations of uses of the mails and wires by the Saudi defendants allegedly in furtherance of the fraudulent schemes. These examples are sufficient to support Dooley's claim that the Saudi defendants committed the predicate acts of mail and wire fraud.

In making these findings, the Court is mindful of the present stage of this litigation. In determining a motion to dismiss, a Court should construe pleadings liberally. *H.J., Inc.,* 492 U.S. at 249, 109 S.Ct. at 2905. Considered in a light most favorable to the plaintiff, Dooley's allegations are sufficient to support his RICO claims based on the predicate acts of mail and wire fraud.

### 2. Money Laundering/Arms Export Control Act Violations

Dooley also has alleged that the British defendants violated the Money Laundering Control Act ("MLCA"), by violating the Arms Export Control Act ("AECA"). 18 U.S.C. §§ 1956, 1957. The MLCA prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity. Dooley claims that the unlawful activity is a violation of the AECA. He alleges that the defendants' participated with defendant UTC/Sikorsky in the submission of false or misleading statements to the United States Government contained in their manufacturing license application. He further alleges that the British defendants' payments to UTC under the license promoted the AECA violation, and thereby, violated the MLCA.

These allegations are sufficient to establish a MLCA/AECA violation as predicate for Dooley's RICO claim against the British defendants. The defendants complain that Dooley fails to allege facts showing how the basic license payments derived from an unlawful act. But Dooley has alleged facts which support his claim that the licensing arrangement, including the payments, between the British defendants

and UTC/Sikorsky led to or promoted what Dooley alleges was misrepresentations or falsehoods in the Amendment 4 application. Dooley is not required to prove these allegations in his Complaint. His allegations that these payments took place and that they promoted an underlying AECA violation are sufficient.

### III. Non–RICO And State Law Counts

In its Opinion, filed on June 17, 1992, this Court dismissed Counts III, XII, XIII, and XIV of plaintiff Dooley's Complaint as to the remaining United States defendants. For the reasons stated in that Opinion, the Court now dismisses Counts III, XII, XIII and XIV as to the British and Saudi defendants. Plaintiff Dooley's remaining state law counts which include these defendants are sufficient.

### IV. Conclusion

The Court concludes that personal jurisdiction over the British and Saudi defendants exists under the District of Columbia long-arm statute. The Court further concludes that the plaintiff has stated a claim against the British and Saudi defendants as to Counts I and II, alleging RICO violations and several state law counts. For the reasons set forth above, the Court denies the British defendants' motion to dismiss and also denies the Saudi defendants' motion to dismiss.