**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Donald CASTLE, and Darrell W.T.
Lowry, Defendants–Appellees.**

**No. 90–1455.**

United States Court of Appeals,
Fifth Circuit.

March 8, 1991.

Peter B. Clark, Sr. Litigation Counsel, Deputy Chief, Marie O'Rourke and Sara Criscitelli, U.S. Dept. of Justice, Crim. Div., Washington, D.C., for plaintiff-appellant.

William Kim Waide, Dallas, Tex., for Castle.

William D. Sheetz, Dallas, Tex., for Lowry.

Before WISDOM, JOLLY, and DAVIS, Circuit Judges.

PER CURIAM:

In this case, we are called upon to consider the Foreign Corrupt Practices Act of 1977 (hereinafter "FCPA"), 15 U.S.C. §§ 78dd–1, 78dd–2, and determine whether "foreign officials," who are excluded from prosecution under the FCPA itself, may nevertheless be prosecuted under the general conspiracy statute, 18 U.S.C. § 371, for conspiring to violate the FCPA.

We hold that foreign officials may not be prosecuted under 18 U.S.C. § 371 for conspiring to violate the FCPA. The scope of our holding, as well as the rationale that undergirds it, is fully set out in Judge Sanders's memorandum opinion of June 4,

---

1990, 741 F.Supp. 116, which we adopt and attach as an appendix hereto.[1]

The judgment of the district court is AFFIRMED.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

United States of America

v.

John Blondek, Vernon R. Tull, Donald Castle, and Darrell W.T. Lowry

Criminal No. 3–90–062–H

Filed June 4, 1990

## MEMORANDUM OPINION AND ORDER

All four defendants in this case are charged in a one-count indictment with conspiring to violate the Foreign Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. §§ 78dd–1, 78dd–2. Defendants Castle and Lowry have moved to dismiss the indictment against them on the grounds that as Canadian officials, they cannot be convicted of the offense charged against them. The two other defendants, Blondek and Tull, are U.S. private citizens, and they do not challenge their indictment on this ground. The Court has considered supplemental briefing and oral argument on the motions.

The indictment charges all four defendants with conspiring to bribe foreign officials in violation of the FCPA. Blondek

and Tull were employees of Eagle Bus Company, a U.S. concern as defined in the FCPA. According to the indictment, they paid a $50,000 bribe to Defendants Castle and Lowry to ensure that their bid to provide buses to the Saskatchewan provincial government would be accepted.

There is no question that the payment of the bribe by Defendants Blondek and Tull is illegal under the FCPA, and that they may be prosecuted for conspiring to violate the Act. Nor is it disputed that Defendants Castle and Lowry could not be charged with violating the FCPA itself, since the Act does not criminalize the receipt of a bribe by a foreign official. The issue here is whether the Government may prosecute Castle and Lowry under the general conspiracy statute, 18 U.S.C. § 371, for conspiring to violate the FCPA. Put more simply, the question is whether foreign officials, whom the Government concedes it cannot prosecute under the FCPA itself, may be prosecuted under the general conspiracy statute for conspiring to violate the Act.

In *Gebardi v. United States*, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), the Supreme Court confronted a similar issue: whether a woman who agreed to be transported by her lover across state lines to engage in sexual intercourse could be convicted of a conspiracy to violate the Mann Act. The Mann Act prohibited the transportation of women across state boundaries for immoral purposes, but did not criminalize the conduct of the women being transported. Acknowledging that it could not prosecute the woman for violating the

---

**1.** With but one exception, our adoption of Judge Sanders's exemplary opinion is plenary. On page 835 [741 F.Supp. at page 119], Judge Sanders notes:

The Government argues that the following statement in the House Report evinces a clear intent by Congress to allow conspiracy prosecutions of foreign officials: "The concepts of aiding and abetting and joint participation would apply to a violation under this bill in the same manner in which those concepts have always applied in both SEC civil actions and implied private actions brought under the securities laws generally." H.R.Rep. No. 640

at 8. The Government's reliance is misplaced. Congress included this statement to clarify the rights of *civil* litigants pursuing a private right of action under the Act, an area entirely different from criminal prosecutions. R. 242–43 (emphasis in original). We believe Judge Sanders erred in his conclusion that this shred of legislative history refers only to civil cases; rather, at the time in question, Congress was contemplating both civil and criminal actions. *See* H.R.Rep. No. 640 at 8. We find that this reference fails to detract from the ultimate correctness of the conclusion that Congressional intent supports the dismissal of the indictment against these foreign official defendants.

Mann Act itself, the Government prosecuted her instead for conspiring to violate the Mann Act. The woman objected to her conviction on the grounds that the Mann Act exempted her from prosecution for her participation.

The Court noted first that the incapacity of a person to commit the substantive offense does not necessarily imply that he may conspire with others to commit the offense with impunity, since the state may criminalize the collective planning of the criminal conduct. *Id.* at 120–21, 53 S.Ct. at 37. For example, it is a crime for a bankrupt to conceal property from his trustee, and thus only bankrupts may be convicted of the substantive offense of concealing property. But convictions of others for conspiring with the bankrupt to conceal property have been upheld. *See id.* at 120 n. 5, 53 S.Ct. at 37 n. 5 and cases cited therein.

The Court distinguished the case before it on the grounds that a violation of the Mann Act necessarily required the agreement of the woman to the criminal act—her transportation across a state line. Yet the Act did not make the woman's consent a crime. The Court concluded that by excluding the transported woman from prosecution under the Mann Act, Congress evinced an affirmative legislative policy "to leave her acquiescence unpunished." *Id.* at 123, 53 S.Ct. at 38. A necessary implication of that policy was that the woman's agreement to participate was immune from any kind of prosecution, including prosecution for conspiring to violate the Mann Act. To do otherwise, the Court reasoned, would allow the Executive Branch to extend the reach of the Act beyond the scope of Congress' intention.

We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an insepara-

ble incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter. It would contravene that policy to hold that the very passage of the Mann Act effected a withdrawal by the conspiracy statute of that immunity which the Mann Act itself confers.

*Id.* at 123, 53 S.Ct. at 38. On this basis, the Court reversed the conviction of the woman for conspiring to violate the Mann Act.

The principle enunciated by the Supreme Court in *Gebardi* squarely applies to the case before this Court. Congress intended in both the FCPA and the Mann Act to deter and punish certain activities which necessarily involved the agreement of at least two people,[1] but Congress chose in both statutes to punish only one party to the agreement. In *Gebardi* the Supreme Court refused to disregard Congress' intention to exempt one party by allowing the Executive to prosecute that party under the general conspiracy statute for precisely the same conduct. Congress made the same choice in drafting the FCPA, and by the same analysis, this Court may not allow the Executive to override the Congressional intent not to prosecute foreign officials for their participation in the prohibited acts.

In drafting the Mann Act, Congress was probably motivated by a protective instinct toward women based on a belief that most women would not participate in the activity without coercion or duress by the man involved. The Government tries to distinguish *Gebardi* on this ground, asserting that "the exception" provided in *Gebardi* to prosecution for conspiracy only applies to individuals belonging to the class of persons the criminal statute was designed to protect.

Nothing in *Gebardi* indicates that only "protected" persons are exempted from conspiracy charges; rather, the Court explicitly built its analysis on Congress' clear intention, evinced by the plain language of

---

1. In the Mann Act the two necessary parties were the transporter and the transported woman, and in the FCPA the necessary parties were the U.S. company paying the bribe and the foreign official accepting it.

the statute, to exempt the transported women from *all* prosecutions for their involvement in the prohibited activities. A similar intent is apparent from the language of the FCPA, especially when compared to other bribery statutes which criminalize both the payment and receipt of bribes. *Compare* 15 U.S.C. §§ 78dd–1 and 78dd–2 *with* 18 U.S.C. § 201 (both payment and receipt of bribe to influence an official act prohibited; passed seven years before FCPA); 18 U.S.C. §§ 210 and 211, 212 and 213, 214 and 215 and 216 (parallel provisions prohibiting payment and receipt of bribes).

Even accepting the general idea that Congress must have some reason for exempting from prosecution a class of persons necessarily involved in the proscribed conduct, Congress was quite explicit about its reasons, but none of these reasons have anything to do with foreign officials. Instead, the exclusive focus was on the U.S. companies and the effects of their conduct within and on the United States.

First, Congress was concerned about the domestic effects of such payments. In the early 1970's, the Watergate affair and resulting investigations revealed that the payment of bribes to foreign officials was a widespread practice among U.S. companies. In the House Report accompanying an earlier version of the Act, it was noted that more than 400 companies had admitted making such payments, distributing well over 300 million dollars in corporate funds to foreign officials. H.R.Rep. No. 640, 95th Cong., 1st Sess. 4 (1977). Such massive payments had many negative domestic effects, not the least of which was the distortion of, and resulting lack of confidence in, the free market system within the United States.

The payment of bribes to influence the acts or decision of foreign officials ... is unethical. It is counter to the moral expectations and values of the American public. But not only is it unethical, it is bad business as well. It erodes public confidence in the integrity of the free market system.... In short, it rewards corruption instead of efficiency and puts pressure on ethical enterprises to lower their standards or risk losing business.

*Id.* at 4–5. *See also* S.Rep. No. 114, 95th Cong., 1st Sess. 4, *reprinted in* 1977 U.S. Code Cong. & Admin.News 4098, 4101. The House Committee further noted that many of the payments were made not to compete with foreign companies, but rather to gain an edge over a competitor in the United States. H.R.Rep. No. 640 at 5.

Congress' second motivation was the effect of such payments by U.S. companies on the United States' foreign relations. The legislative history repeatedly cited the negative effects the revelations of such bribes had wrought upon friendly foreign governments and officials. *Id.; see also* S.Rep. No. 114 at 4, 1977 U.S.Code Cong. & Admin.News at 4101. Yet the drafters acknowledged, and the final law reflects this, that some payments that would be unethical or even illegal within the United States might not be perceived similarly in foreign countries, and those payments should not be criminalized. For example, grease payments, those payments made "to assure or to speed the proper performance of a foreign official's duties," are not illegal under the Act since they were often a part of the custom of doing business in foreign countries. H.R.Rep. No. 640 at 8; *see also* 15 U.S.C. § 78dd–2(b). Additionally, the Act was later amended to permit an affirmative defense on the grounds that the payment was legal in the country in which it was made. 15 U.S.C. § 78dd–2(c)(1). These exclusions reinforce the proposition that Congress had absolutely no intention of prosecuting the foreign officials involved, but was concerned solely with regulating the conduct of U.S. entities and citizens.[2]

---

**2.** Congress considered, and rejected, the idea that a demand for a payment by a foreign official would be a valid defense to a criminal prosecution under the Act, because

at some point the U.S. company would make a conscious decision whether or not to pay a

bribe. That the payment may have been first proposed by the recipient rather than the U.S. company does not alter the corrupt purpose on the part of the person paying the bribe. S.Rep. No. 114 at 10–11, 1977 U.S.Code Cong. & Admin.News at 4108. The very fact that Con-

The Government argues that the following statement in the House Report evinces a clear intent by Congress to allow conspiracy prosecutions of foreign officials: "The concepts of aiding and abetting and joint participation would apply to a violation under this bill in the same manner in which those concepts have always applied in both SEC civil actions and implied private actions brought under the securities laws generally." H.R.Rep. No. 640 at 8. The Government's reliance is misplaced. Congress included this statement to clarify the rights of *civil* litigants pursuing a private right of action under the Act, an area entirely different from criminal prosecutions.

This language does not refute the overwhelming evidence of a Congressional intent to exempt foreign officials from prosecution for receiving bribes, especially since Congress knew it had the power to reach foreign officials in many cases, and yet declined to exercise that power. *See* H.R. Rep. No. 640 at 12 n. 3 (United States has power to reach conduct of noncitizens under international law). Congress' awareness of the extent of its own power reveals the fallacy in the Government's position that only those classes of persons deemed by Congress to need protection are exempted from prosecution under the conspiracy statute. The question is not whether Congress *could have* included foreign officials within the Act's proscriptions, but rather whether Congress *intended to do so,* or more specifically, whether Congress intended the general conspiracy statute, passed many years before the FCPA, to reach foreign officials.

The drafters of the statute knew that they could, consistently with international law, reach foreign officials in certain circumstances. But they were equally well aware of, and actively considered, the "inherent jurisdictional, enforcement, and diplomatic difficulties" raised by the application of the bill to non-citizens of the United States. *See* H.R.Conf.Rep. No. 831, 95th Cong., 1st Sess. 14, *reprinted in* 1977 U.S. Code Cong. & Admin.News 4121, 4126. In the conference report, the conferees indicated that the bill would reach as far as possible, and listed all the persons or entities who could be prosecuted. The list includes virtually every person or entity involved, including foreign nationals who participated in the payment of the bribe when the U.S. courts had jurisdiction over them. *Id.* But foreign officials were not included.

It is important to remember that Congress intended that these persons would be covered by the Act itself, without resort to the conspiracy statute. Yet the very individuals whose participation was required in every case—the foreign officials accepting the bribe—were excluded from prosecution for the substantive offense. Given that Congress included virtually every possible person connected to the payments except foreign officials, it is only logical to conclude that Congress affirmatively chose to exempt this small class of persons from prosecution.

Most likely Congress made this choice because U.S. businesses were perceived to be the aggressors, and the efforts expended in resolving the diplomatic, jurisdictional, and enforcement difficulties that would arise upon the prosecution of foreign officials was not worth the minimal deterrent value of such prosecutions. Further minimizing the deterrent value of a U.S. prosecution was the fact that many foreign nations already prohibited the receipt of a bribe by an official. *See* S.Rep. No. 114 at 4, 1977 U.S.Code Cong. & Admin.News at 4101 (testimony of Treasury Secretary Blumenthal that in many nations such payments are illegal). In fact, whenever a nation permitted such payments, Congress allowed them as well. *See* 15 U.S.C. § 78dd–2(c)(1).

gress considered this issue underscores Congress' exclusive focus on the U.S. companies in *making* the payment. If the drafters were concerned that a demand by a foreign official might be considered a defense to a prosecution, they clearly were expecting that only the payors of the bribes, and not the foreign officials demanding and/or receiving the bribes, would be prosecuted.

Based upon the language of the statute and the legislative history, this Court finds in the FCPA what the Supreme Court in *Gebardi* found in the Mann Act: an affirmative legislative policy to leave unpunished a well-defined group of persons who were necessary parties to the acts constituting a violation of the substantive law. The Government has presented no reason why the prosecution of Defendants Castle and Lowry should go forward in the face of the congressional intent not to prosecute foreign officials. If anything, the facts of this case support Congress' decision to forego such prosecutions since foreign nations could and should prosecute their own officials for accepting bribes. Under the revised statutes of Canada the receipt of bribes by officials is a crime, with a prison term not to exceed five years, *see Criminal Code*, R.S.C. c. C–46, s.121 (pp. 81–84) (1985), and the Royal Canadian Mounted Police have been actively investigating the case, apparently even before any arrests by U.S. officials. Defendant Castle's and Lowry's Supplemental Memorandum In Support of Motion to Dismiss, filed May 14, 1990, at 10. In fact, the Canadian police have informed Defendant Castle's counsel that charges will likely be brought against Defendants Castle and Lowry in Canada. *Id.* at 10 & nn. 3–4. Thus, prosecution and punishment will be accomplished by the government which most directly suffered the abuses allegedly perpetrated by its own officials, and there is no need to contravene Congress' desire to avoid such prosecutions by the United States.

As in *Gebardi*, it would be absurd to take away with the earlier and more general conspiracy statute the exemption from prosecution granted to foreign officials by the later and more specific FCPA. Following the Supreme Court's admonition in an analogous criminal case that "[a]ll laws are to be given a sensible construction; and a literal application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose," *United States v. Katz*, 271 U.S. 354, 357, 46 S.Ct. 513, 514, 70 L.Ed.

986 (1926), the Court declines to extend the reach of the FCPA through the application of the conspiracy statute.

Accordingly, Defendants Castle and Lowry may not be prosecuted for conspiring to violate the Foreign Corrupt Practices Act, and the indictment against them is DISMISSED.

SO ORDERED.

/s/ Barefoot Sanders
Barefoot Sanders, Chief Judge
United States District Court
Northern District of Texas