UNITED STATES OF AMERICA

v.

James H. GIFFEN, Defendant.

No. S1 03 CR.404(WHP).

United States District Court,
S.D. New York.

July 2, 2004.

498

Philip Urofsky, U.S. Department of Justice, Washington, D.C., Special Counsel for International Litigation Fraud Section.

Steven M. Cohen, William J. Schwartz, Scott J. Pashman, Matthew E. Beck, Kevin D. Galbraith, Kronish, Lieb, Weiner & Hellman LLP, New York, New York, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

The defendant, James H. Giffen ("Defendant" or "Giffen"), moves to dismiss portions of the 62–count indictment[1] against him. The indictment charges Giffen with making unlawful payments totaling more than $78 million to Nurlan Balgimaev, the former Prime Minister and Oil Minister of the Republic of Kazakhstan, and Nursultan Nazarbaev, the current President of Kazakhstan (collectively, "senior Kazakh officials")[2] in violation of the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. § 78dd–2 *et seq.*, mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, 1346, money laundering statutes, 18 U.S.C. §§ 1956, 1957, and the federal income tax laws. 26 U.S.C. §§ 7206, 7212.

Giffen moves to dismiss: (1) Counts One through Fifty–Nine on the ground that they are precluded by the act of state doctrine; and (2) those portions of Counts Fifteen through Twenty–Three that allege a scheme to deprive the citizens of Kazakhstan of the honest services of their government officials.[3]

For the reasons set forth below, Giffen's motion to dismiss is granted in part and denied in part.

## BACKGROUND

The indictment alleges that between 1995 and 1999, Giffen made unlawful payments totaling $78 million to senior Kazakh officials to obtain business for his New York-headquartered company Mercator Corporation ("Mercator").[4] (Ind.¶¶ 2–6.) From the business obtained by Mercator, Giffen directed millions of dollars in unreported compensation to a Mobil Oil executive, a Mercator employee and himself. (Ind.¶¶ 64, 98, 100–01, 107–12.) The Indictment alleges a series of complex financial transactions that enabled Mercator to conceal illicit payments to the senior Kazakh officials. (Ind.¶¶ 18–25, 28–29, 34–40, 44–46, 50–51, 53–58.)

Kazakhstan, formerly a republic within the Soviet Union, became a sovereign nation in 1991. (Ind.¶ 1.) Kazakhstan has vast oil and gas reserves, which are the property of the Kazakh government. (Ind. ¶ 1.) Since its independence, Kazakhstan has sold rights to its oil and gas reserves to international oil companies. (Ind.¶ 1.) The Kazakh government hired Mercator to advise it regarding these oil and gas transactions. (Ind.¶ 2.)

The indictment alleges that on or about August 1, 1995, Giffen was named a Coun-

---

**1.** On March 15, 2004, the Government filed a 65–count superseding indictment. The superseding indictment added new charges relating to tax offenses. Giffen does not, however, challenge any of the tax counts.

**2.** Although the indictment refers to Balgimaev and Nazarbaev as KO–1 and KO–2 respectively, the Government identified them by name in opposition to this motion. (Government Opposition to Defendant's Pretrial Motions ("Opp.Mem.") at 4.)

**3.** Initially, Giffen moved to dismiss a portion of the Indictment based on a statute of limita-

tions bar. However, the Defendant abandoned that argument when he learned that the Government obtained an Order tolling the statute of limitations. (Opp.Mem.Ex. D.) Giffen also moves to compel discovery from the Government. Those issues are addressed in a companion Memorandum and Order.

**4.** Giffen was Mercator's principal shareholder, board chairman and chief executive officer. (Superseding Indictment, dated March 15, 2004 ("Ind.") ¶ 3.)

selor to the President of Kazakhstan. (Ind.¶3.) The Counselor position was a semi-official title that enabled Giffen to effect numerous oil and gas transactions. (Ind.¶3.)[5] In December 1994, Mercator entered into an agreement with the Kazakh Ministry of Oil and Gas Industries to assist the Ministry in developing a strategy for foreign investment in Kazakhstan's natural resources. (Ind.¶4.) The agreement further provided that Mercator would receive substantial success fees if the oil and gas transactions were completed. (Ind.¶4.)

Between 1995 and 2000, Mercator received nearly $67 million in success fees from the Kazakh government (Ind.¶5.) for its work on the Tengiz oil fields (Ind.¶¶ 12–25), the Karachaganak oil and gas fields (Ind.¶¶ 26–29), the Caspian Pipeline (Ind. ¶¶ 30–40), the Karachaganak Production Sharing Agreement (Ind.¶¶ 41–46), the Offshore Kazakhstan International Operating Company (Ind.¶¶ 47–51), and the Kazakhoil transactions (Ind.¶¶ 52–58).

Apart from Mercator's success fees on these transactions, Giffen deposited approximately $70 million into escrow accounts at Banque Indosuez and its successor, Credit Agricole Indosuez, located in Switzerland. (Ind.¶5.) According to the indictment, Giffen then diverted these escrow monies into the Swiss bank accounts of several different offshore entities to conceal the fact that they were benefiting the senior Kazakh officials. (Ind.¶¶ 5, 19, 20, 44, 46, 51, 56–58.)

In total, the Government contends that Giffen funneled more than $78 million in cash and luxury items to the senior Kazakh officials for their personal benefit.

(Ind.¶ 5.) For example, Giffen purportedly paid $36,000 of Balgimbaev's personal bills (Ind.¶ 59), and gifted an $80,000 speedboat to Nazarbaev. (Ind.¶¶ 60–63.) According to the indictment, the senior Kazakh officials had the power to help obtain and retain "lucrative business as advisors and counselors to the government of Kazakhstan." (Ind.¶ 6.) The illegal payments thus ensured that Giffen and Mercator "remained in a position from which they could divert large sums from oil transactions into accounts for the benefit of senior Kazakh officials and Giffen personally." (Ind.¶ 6.)

Based on these allegations, the indictment charges Giffen with numerous federal crimes, including, *inter alia*, (i) conspiracy to violate the FCPA and substantive FCPA crimes; (ii) conspiracy to defraud Kazakhstan of "tens of millions of dollars" and substantive counts of mail and wire fraud; and (iii) conspiracy to participate in a scheme to "deprive the citizens of Kazakhstan of their intangible right to the honest services of their political leaders" and substantive counts of mail and wire fraud. (Ind.¶¶ 66–125.)

## DISCUSSION

On a motion to dismiss, the allegations of the indictment are accepted as true. *See United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 33 n. 2, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir.1985). "Contrary assertions of fact by the defendant[ ] will not be considered." *Goldberg*, 756 F.2d at 950 (*citing*

---

**5.** Giffen has submitted documents to show that the Kazakh government appointed him to various official positions. (*See* Declaration of Kevin D. Galbraith, dated March 12, 2004 ("Galbraith Decl.") Exs. B–H.) These documents establish that Giffen was appointed at various times as a representative, consultant or agent by different Kazakh government officials.

*United States v. Von Barta,* 635 F.2d 999, 1002 (2d Cir.1980)).

## I.  *Foreign Corrupt Practices Act*

■ The FCPA makes it illegal for an individual or company in the United States to make illicit payments to a foreign official to cause that foreign official to assist in obtaining or retaining business for the payor. *See* 15 U.S.C. § 78dd–2(a).

Congress enacted the FCPA in 1977 to criminalize bribery of foreign officials by domestic corporations. *See United States v. Castle,* 925 F.2d 831, 834–35 (5th Cir. 1991). The FCPA was amended in 1998 to implement the Organization of Economic Cooperation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention"). *See In re Grand Jury Subpoena dated August 9, 2000,* 218 F.Supp.2d 544, 550 (S.D.N.Y.2002); *United States v. Kay,* 359 F.3d 738, 750 (5th Cir.2004). The 1998 amendments expanded FCPA coverage to all persons, defined as American citizens, nationals or residents, or American corporations. *See* OECD Convention, art. 1(1); *see also In re Grand Jury,* 218 F.Supp.2d at 550.

Despite the FCPA's prohibition on bribery of foreign officials, an exception exists for "facilitating" payments to "expedite or to secure the performance of a routine governmental action by a foreign official, political party, or party official." 15 U.S.C. § 78dd–2(b); *see also Kay,* 359 F.3d at 750. The term "routine governmental action," however, does not extend to decisions by a foreign official to award new business or continue business with a particular contractor. *See* 15 U.S.C. § 78dd–2(h)(4)(B); *see also Kay,* 359 F.3d at 750–51.

In his motion, Giffen does not dispute the FCPA's applicability to the actions charged in the indictment. Accepting those allegations as true, the illicit payments to senior Kazakh officials were for the sole purpose of obtaining and retaining business for Mercator. Giffen does not argue that the $78 million was a "facilitating" payment. Nor could the alleged payments be characterized as "facilitating" a routine governmental action because, as alleged in the indictment, they were primarily intended to influence the senior Kazakh officials to award new business to Mercator. *See generally W.S. Kirkpatrick & Co., Inc. v. Envt'l. Tectonics Corp., Int'l,* 493 U.S. 400, 409–10, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (applying the FCPA where defendant bribed Nigerian officials to obtain a construction contract from the Nigerian government).

## II.  *Act of State Doctrine*

Giffen argues that Counts One through Fifty–Nine should be dismissed because they are barred by the act of state doctrine.

### A.  *Applicable Legal Standards*

■ "[T]he act of state doctrine ... 'precludes the courts of this country from inquiring into the validity of the Public acts a recognized foreign sovereign power committed within its own territory.' " *Alfred Dunhill of London v. Republic of Cuba,* 425 U.S. 682, 706, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (*quoting Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)); *accord W.S. Kirkpatrick,* 493 U.S. at 405, 110 S.Ct. 701. "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon— the effect of official action by a foreign sovereign." *W.S. Kirkpatrick,* 493 U.S. at 406, 110 S.Ct. 701 (emphasis in original). While a United States court may question the wisdom of a foreign sovereign act, it

may not rule on its legality or validity. *W.S. Kirkpatrick,* 493 U.S. at 406–07, 110 S.Ct. 701. As such, the act of state doctrine requires a court to deem the "acts of foreign sovereigns taken within their own jurisdictions" as lawful and valid. *W.S. Kirkpatrick,* 493 U.S. at 409, 110 S.Ct. 701.

■ "The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill,* 425 U.S. at 697, 96 S.Ct. 1854; *see also W.S. Kirkpatrick,* 493 U.S. at 404, 110 S.Ct. 701 (noting that the act of state doctrine is "a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs") (*quoting Sabbatino,* 376 U.S. at 423, 84 S.Ct. 923). Where the Executive Branch files an action, however, courts are reluctant to invoke the act of state doctrine on this rationale. *See, e.g., United States v. Noriega,* 746 F.Supp. 1506, 1523 (S.D.Fla.1990) (finding that the act of state doctrine was inapplicable where the Executive Branch had indicted and prosecuted the defendant); *United States v. Evans,* 667 F.Supp. 974, 987 (S.D.N.Y.1987) (finding that a prosecution was not barred under the act of state doctrine where the Executive Branch was "prosecuting the defendants"). In this case, the Government submitted a letter from the Assistant Attorney General for the Criminal Division of the Department of Justice, asserting that it was acting on behalf of the Executive Branch. (*See* Opp. Mem. Ex. C.) At argument, the Assistant United States Attorney for the Southern District of New York represented that the Department of State had "endorsed" the Government's position on the act of state doctrine. (*See* Transcript of Oral Argument, dated June 3, 2004 ("Tr.") at 14.) Thus, any concern that this action will intrude on the Executive Branch's conduct of foreign affairs has been adequately assuaged by the Government.

#### B. *Merits*

Giffen argues that the activities charged in the indictment were all performed in his capacity as an agent of the Kazakh government. (Memorandum in Support of Defendant's Pretrial Motions ("Def.Mem.") at 4–5.) He asserts that he was "authorized to establish, maintain and operate … bank accounts" on behalf of Kazakhstan and that his duties required him "to receive fees, deposits, bonuses or other funds on behalf of the [Kazakh] Government," and "maintain appropriate accounts in international financial organizations and banks." (Def. Mem. at 5–6.) Giffen contends that because he was acting as an official of the Kazakh government, this Court must consider the "validity of the law of Kazakhstan and the official acts of its leaders." (Def. Mem. at 12.)

As a preliminary matter, this Court must decide whether it will have to invalidate any official act of Kazakhstan. Giffen is charged with bribing the senior Kazakh officials. (Ind.¶¶ 5, 19, 20, 44, 46, 51, 56–63.) Those charges are similar to the allegations in *W.S. Kirkpatrick,* where the failed bidder on a Nigerian construction project claimed that the successful bidder had bribed Nigerian officials. 493 U.S. at 401–02, 110 S.Ct. 701. While the Supreme Court agreed that the district court would have to find facts that might impugn the Nigerian government's motives, it concluded that the act of state doctrine did not bar suit because the district court would not be required to rule on the legality or validity of any public act of the Nigerian

government. *W.S. Kirkpatrick,* 493 U.S. at 408, 110 S.Ct. 701.

Similarly, this Court concludes that factual findings in this case might impugn the motives of the Kazakh government in its dealings with Mercator. However, this Court will not need to rule on the legality of any public acts of the Kazakh government. In essence, Giffen's argument is that his *de facto* position within the Kazakh government enabled him to pay the senior Kazakh officials—not that his official duties required him to make secret payments.

The act of state doctrine also has a territorial dimension in that it is limited to "acts done within their own States, in the exercise of Governmental authority." *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). Here, the illicit activities occurred in the United States and Switzerland—not Kazakhstan. (Ind.¶¶ 15–22, 24, 28, 31–32, 37, 41, 48, 53.) Moreover, Giffen allegedly transferred funds from Swiss bank accounts to non-Kazakh corporations. (Ind.¶¶ 20, 21, 22, 29, 35, 46, 51, 58.) Because these transactions were dehors the geographic boundaries of Kazakhstan and involved transactions among foreign corporations, the act of state doctrine does not prohibit this Court from ruling on their legality. *See W.S. Kirkpatrick,* 493 U.S. at 405, 110 S.Ct. 701 (noting that the act of state doctrine has only been applied where "the relief sought ... would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory"); *accord Sabbatino,* 376 U.S. at 422–25, 84 S.Ct. 923.

Further, some courts have determined that the act of state doctrine does not reach "acts committed by foreign sovereigns in the course of their purely commercial operations." *Alfred Dunhill,* 425 U.S. at 706, 96 S.Ct. 1854 (plurality opinion); *see also Lyondell–Citgo Refining, LP v. Petroleos de Venezuela, S.A.,* No. 02 Civ. 0795(CBM), 2003 WL 21878798, at *8–9 (S.D.N.Y. Aug.8, 2003) (declining to apply the act of state doctrine where parties' contract made transactions commercial, as opposed to governmental). The indictment alleges deposits of monies into foreign banks, which were then used by Giffen to fund offshore entities for the personal benefit of the senior Kazakh officials. (Ind.¶¶ 5, 19, 20, 40, 44, 46, 51, 56–58.) These actions were commercial—not governmental, and are not immune under the act of state doctrine. *See Lyondell–Citgo,* 2003 WL 21878798, at *8–9.

■ The FCPA countenances an affirmative defense where the payments were "lawful under the written laws and regulations of the foreign official's ... country." 15 U.S.C. § 78dd–2(c)(1). But, Giffen does not assert that the challenged payments were lawful under Kazakh law. Rather, he argues that his actions were effected pursuant to the powers conferred by the Kazakh government. (Def. Mem. at 13–15.) Because Giffen claims to have acted as a Kazakh government representative, he argues that his payments to senior Kazakh officials are shielded from FCPA scrutiny. (Def. Mem. at 15.) The letters of appointment that Giffen offers, however, fail to show that his secret payments constituted official acts of Kazakhstan. (*See* Galbraith Decl. Exs. B–H.) Giffen's various official titles do not exempt his actions from prosecution by the United States. *See, e.g., Noriega,* 746 F.Supp. at 1521–22 (finding defendant's alleged drug trafficking and protection of money launderers could not constitute public action merely because he was the leader of his country).

Accordingly, this Court concludes that the act of state doctrine does not bar Giffen's prosecution.

## III. Deprivation of Honest Services

The indictment alleges that Giffen's actions violated 18 U.S.C. § 1346 by depriving the citizens of Kazakhstan of the honest services of their government officials. (*See* Ind. ¶¶ 10–11, 70–81.) Giffen asserts that application of the honest services theory of Section 1346 to Kazakhstan impermissibly extends the mail and wire fraud statutes to cover activities beyond Congress' original intent. (Def. Mem. at 1; *see also* Reply Memorandum in Support of Defendant's Pretrial Motion ("Reply Mem.") at 13–14.) He also argues that Section 1346 is unconstitutionally vague as applied to him, and that it violates fundamental principles of international comity.

Notably, Giffen does not challenge the indictment's reliance on the mail and wire fraud statutes to criminalize schemes that deprive foreign victims of money or property. (Reply Mem. at 12.) Thus, Giffen does not seek dismissal of Counts Fifteen through Twenty–Three to the extent they rely on the mail and wire fraud statutes.

### A. Section 1346's Scope

Section 1346 provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In 1988, Congress enacted Section 1346 to overrule *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and reinstate the intangible rights theory. *United States v. Rybicki,* 354 F.3d 124, 133–34 (2d Cir. 2003) (en banc). In *McNally,* the Supreme Court held that the then-existing mail fraud statute did not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly." *McNally,* 483 U.S. at 358, 107 S.Ct. 2875.

As such, under *McNally,* schemes to deprive others of their intangible rights to good government and honest services were beyond the mail and wire fraud proscriptions. *Rybicki,* 354 F.3d at 134.

"[W]hen [Congress] enacted ... [Section 1346]—Congress was recriminalizing mail- and wire-fraud schemes to deprive others of that 'intangible right of honest services,' which had been protected before *McNally.*" *Rybicki,* 354 F.3d at 138. Accordingly, this Court must examine pre-*McNally* precedent to determine whether the honest services theory is applicable to a United States citizen for deprivation of honest services by foreign government officials to foreign nationals. (Tr. at 30–31, 41.)

The Government argues that pre-*McNally* jurisprudence applied the wire and mail fraud statutes to criminalize deprivation of honest services to foreign citizens by their own governments. (Opp. Mem. at 28–29.) However, the Government offers the slenderest of reeds to support its expansive interpretation; namely, an indictment in this district in 1978 and another the same year in the District of Columbia. (Opp. Mem. at 28–29.) At argument, the Government conceded that there were no court decisions addressing the validity of the two 25–year old indictments. (Tr. at 42.) Nor could the Government point to any decision where a court upheld application of the honest services theory in an international setting involving a foreign government and its citizens. (Tr. at 42.)

Of more recent vintage, the Government alluded to *United States v. Lazarenko,* No. CR 00–0284(MJJ), pending in the Northern District of California. (Tr. at 49.) There, the defendant, a former president of the Republic of Ukraine, was charged with depriving Ukrainian citizens of the honest services of their government offi-

cials. *United States v. Lazarenko,* at 1–2 (N.D.Cal. Sept. 10, 2003) (order on applicability of foreign law to Lazarenko's prosecution) (*"Lazarenko I"*). Tellingly, the district court dismissed the honest services charge at the close of the evidence, because the government failed to prove that the defendant violated any provision of Ukrainian law analogous to Section 1346. *See United States v. Lazarenko,* at 4–5 (N.D.Cal. May 7, 2004) (order granting in part and denying in part Rule 29 motion) (*"Lazarenko II"*). Notably, the *Lazarenko* court required the Government to show the existence of a law in Ukraine analogous to Section 1346 that was violated by the defendant. *Lazarenko I,* at 11–12. Here, however, the Government makes no allegation regarding any Kazakh law, much less a Kazakh statute, analogous to Section 1346. In fact, the Government noted that it did not intend to provide the jury with any Kazakh law on this issue. (Tr. at 46.)

That three different United States Attorneys in three different districts over a twenty-five year time span obtained indictments under an intangible rights theory, grounded between a foreign government and its citizenry, is not the kind or quality of precedent this Court need consider. The Government has not unearthed any published decision on this issue. The question appears to be one of first impression.

The touchstone is whether any pre-*McNally* precedent supports prosecution of American citizens for depriving foreign nationals of the honest services of their own government officials. *See Rybicki,* 354 F.3d at 138 (noting that when Congress "enacted [Section 1346]—Congress was recriminalizing mail- and wire-fraud schemes to deprive others of that intangible right of honest services, which had been protected before *McNally,* not all intangible rights of honest services whatever they might be thought to be") (internal quotations omitted). In view of the total absence of pre-*McNally* precedent supporting the Government's overseas application of the intangible rights theory, this Court concludes that in enacting Section 1346 Congress was merely recriminalizing the deprivation of the intangible right to honest services as it existed before *McNally. See Rybicki,* 354 F.3d at 138. As a corollary, this Court holds that Section 1346 did not criminalize deprivations of "all intangible rights of honest services, whatever they might be thought to be." *See Rybicki,* 354 F.3d at 137–38. In fact, "[t]here is no reason to think that Congress sought to grant carte blanche to federal prosecutors, judges and juries to define 'honest services' from case to case for themselves." *Rybicki,* 354 F.3d at 138.

The Government also argues that Congress' 1988 amendments to the FCPA considered and rejected the notion that mail and wire fraud statutes should not reach bribery of foreign government officials. (Opp. Mem. at 28.) From this, the Government draws two conclusions: (1) Congress was aware that foreign bribery violated the mail and wire fraud statutes as they existed in 1988; and (2) Congress was comfortable with that result. (Opp. Mem. at 28.) The Government's contention is not persuasive. Subsequent legislative history does not provide a reasonable platform to interpret an original statute's text or legislative history. *See Doe v. Chao,* — U.S. —, —, 124 S.Ct. 1204, 1212, 157 L.Ed.2d 1122 (2004) ("[S]ubsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.") (internal quotation omitted). Indeed, discarded legislative proposals are seldom useful in interpreting an existing statute. *See Solid Waste Agency of N. Cook Coun-*

*ty v. United States Army Corps of Eng'rs,* 531 U.S. 159, 169–70, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute. A bill can be proposed for any number of reasons, and it can be rejected for just as many others.") (internal brackets and quotation marks omitted).

Accordingly, this Court finds that Congress did not intend that the intangible right to honest services encompass bribery of foreign officials in foreign countries.

### B. *Vagueness*

Giffen also argues that application of the honest services theory to his alleged bribery scheme is unconstitutionally vague. This Court agrees. First, the text of Section 1346 does not mention bribery of foreign officials. Second, the legislative history of Section 1346 is silent in this regard. And finally, there are no published decisions addressing the honest services theory that the Government espouses in this case.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Phrased differently, "[t]he constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Harriss,* 347 U.S. at 617, 74 S.Ct. 808.

■ The Second Circuit has "repeatedly held that when ... interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' *i.e.,* 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.' " *Rybicki,* 354 F.3d at 129 (*quoting United States v. Nadi,* 996 F.2d 548, 550 (2d Cir. 1993)); *accord United States v. Jackson,* 968 F.2d 158, 161 (2d Cir.1992); *United States v. Coonan,* 938 F.2d 1553, 1562 (2d Cir.1991).

■ The Second Circuit has rejected a vagueness challenge to Section 1346 as applied to domestic private-sector kickback schemes. *See Rybicki,* 354 F.3d 124. However, the question here is whether Section 1346 is vague as applied to Giffen's foreign bribery scheme—not as applied generally or to domestic private-sector schemes. As noted, Congress enacted Section 1346 to recriminalize "schemes to deprive others of *that* 'intangible right of honest services,' which had been protected before *McNally.*" *Rybicki,* 354 F.3d at 138 (emphasis in original). The intangible right to honest services for foreign citizens, however, was never recognized before *McNally.* (*See infra* pp. 504–505.)

While the pre-*McNally* cases applying the honest services theory to public sector corruption cases are legion, *see McNally,* 483 U.S. at 363 n. 1, 107 S.Ct. 2875 (Stevens, J. dissenting), none of them apply the intangible rights theory to corruption in a foreign nation. Moreover, extension of the intangible rights theory to Giffen and the Kazakh citizenry is more ethereal. The claimed violation is the deprivation of the honest services of Kazakh government officials to the Kazakh citizenry. Deciding that issue requires an analysis of the compact between Kazakh citizens and their

government. *Lazarenko I,* at 10–11. In turn, the inquiry would require this Court to determine what constitutes honest services in the Kazakh landscape, untethered to any Kazakh statute analogous to Section 1346. *See Harriss,* 347 U.S. at 617, 74 S.Ct. 808 (noting that a criminal statute must give notice to a person of ordinary intelligence that his conduct is forbidden). Under such circumstances, this Court concludes that the application of Section 1346 to Giffen is unconstitutionally vague. *See Rybicki,* 354 F.3d at 135 ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.") (internal quotations and citations omitted).

### C. *International Comity*

■ Finally, Giffen contends that the application of the intangible rights theory to him presents a "non-justiciable" controversy. (Def. Mem. at 26.) Giffen argues that "[t]here can be no violation of [S]ection 1346 in a public corruption case unless a government official owed a duty of honest services to the public." (Def. Mem. at 26.) He further contends that while the scope of "honest services" is well understood in the United States, it is obscure and ambiguous in a developing nation, like Kazakhstan. (Def. Mem. at 26.)

The concept of the Kazakh people's intangible right to honest services by their government officials requires definition. *See United States v. Brumley,* 116 F.3d 728, 734 (5th Cir.1997) (noting that under Section 1346, a court must first decide the duty owed by a defendant); *see also Lazarenko I,* at 11–12, 14. The indictment does not allege any facts or law regarding the meaning of honest services by Kazakh officials to the Kazakh people. (Tr. at 48.) The Government's argument that "[t]he notion that government officials owe a duty to provide honest services to the pub-

lic is not so idiosyncratically American as to have no application at all to Kazakhstan" (Opp. Mem. at 39) is inapposite and begs the question. In a jarring disconnect, the Government acknowledges that "Kazakhstan has sought to derail the investigation and eventual prosecution of this matter by numerous appeals to officials ... in the executive branch including ... [the] Departments of State and Justice." (Opp. Mem. at 36 n. 10.) Implicit in the Government's observation is the suggestion that Kazakhstan itself is unable to define "honest services" within its own polity.

In effect, the Government urges that American notions of honesty in public service developed over two centuries be engrafted on Kazakh jurisprudence. "While admittedly some ... countries do not take their [anti-corruption] responsibilities seriously, the correct answer to such a situation is not the extraterritorial application of United States law but rather cooperation between [the appropriate] home and host country ... authorities." *Rose Hall,* 576 F.Supp. at 164; *see also In re Maxwell Communication Corp.,* 93 F.3d 1036, 1047 (2d Cir.1996) (noting that principles of international comity may limit the reach of a statute, permitting United States courts to decline exercise of jurisdiction in cases properly adjudicated in foreign states). "An argument in favor of the export of United States law represents not only a form of legal imperialism but also embodies the essence of sanctimonious chauvinism." *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,* 576 F.Supp. 107, 163 (D.Del.1983), *aff'd Appeal of Chase Manhattan Overseas Banking Corp.,* 740 F.2d 956 (3d Cir.1984). While well intentioned, the Government's suggestion that American legal standards be exported to Kazakhstan is simply a bridge too far.

508

"Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise." *In re Maxwell*, 93 F.3d at 1047. Until Congress authorizes an expansion of Section 1346 beyond pre-*McNally* precedent, this Court may not consider such an extraterritorial enlargement.

## CONCLUSION

For the reasons set forth above: (1) Giffen's motion to dismiss Counts One through Fifty–Nine of the indictment is denied, and (2) Giffen's motion to dismiss portions of Counts Fifteen through Twenty–Three that allege a scheme to deprive the citizens of Kazakhstan of the honest services of their government officials is granted.