**UNITED STATES of America**

v.

**Hans BODMER, Defendant.**

**No. 03 CR. 947(SAS).**

United States District Court,
S.D. New York.

July 9, 2004.

Mark F. Mendelsohn, Special Assistant United States Attorney, United States Department of Justice, Washington, D.C., Robertson T. Park, Senior Litigation Counsel, Fraud Section, United States Department of Justice, Washington, D.C., for the Government.

Robert S. Bennett, Saul M. Pilchen, Michael P. Kelly, Skadden Arps Slate Meagher & Flom, LLP, Washington, D.C., for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Hans Bodmer is a Swiss national who was arrested while in South Korea on busi-

ness. His arrest stemmed from a sealed United States indictment charging him with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd–2, and launder money in violation of section 1956 of Title 18. Following his arrest, Bodmer was incarcerated in South Korea for five months, and subsequently extradited to the United States. He now moves to dismiss the Indictment.

## I. FACTUAL ALLEGATIONS

### A. Privatization of Azerbaijani State Oil Company

The Government alleges that in 1997, the Republic of Azerbaijan[1] was in the process of privatizing the State Oil Company of the Azerbaijan Republic ("SOCAR"). This undertaking was governed by the State Program of State Property Privatization for 1995–1998, and was administered by Azerbaijan's State Property Committee (the "SPC"). *See* Indictment ¶ 3.

As part of the SOCAR privatization process, every Azerbaijani citizen received, at no cost, a booklet containing four voucher coupons. The vouchers were freely tradeable bearer instruments, and could be used to bid at auction on shares of privatized enterprises, including SOCAR. Foreigners who sought to participate in the auctions by using the vouchers were required to purchase, from the SPC, one "option" for every voucher held. The options were sold at an official government price. *See id.*

### B. The Corporate Entities and Relationships

According to the Government, Oily Rock Group, Ltd., a British Virgin Islands corporation with its principal place of business in Baku, Azerbaijan, was created in 1997 for the purpose of acquiring, at auction, a controlling interest in SOCAR. To that end, Oily Rock entered into agreements ("Investment Agreements") with various investors to acquire and exercise at auction privatization vouchers and options, with the goal of obtaining a controlling interest in SOCAR.[2] Minaret Group, Ltd., a British Virgin Island corporation with its principal place of business in Baku, Azerbaijan, was created at the same time as Oily Rock, and was a party to one such Investment Agreement. *See id.* ¶¶ 4, 5, 18.

At various times throughout 1998, Omega Advisors, Inc., a Delaware corporation with its principal place of business in New York City, entered into Investment Agreements, through its subsidiaries and affiliates, with Oily Rock and Minaret. These subsidiaries and affiliates were formed for the purpose of investing in Azerbaijani privatization vouchers and options. Between March and July of 1998, Omega purchased $126 million in privatization vouchers and options, and wired funds to effectuate the purchases. *See id.* ¶¶ 7, 18, 19.

Oily Rock and Minaret also entered into Investment Agreements with Pharos Capital Management, L.P., a Delaware limited partnership. Pharos Capital Management was in the business of investing

---

**1.** The Republic of Azerbaijan, which regained its independence in 1991 following the collapse of the Soviet Union, is located in southwestern Asia between Iran and Russia, latitude 40 30 N, longitude 47 30 E. It has a Turkic and majority-Muslim population of approximately 7.87 million, ninety percent of whom are part of the Azeri ethnic group. *See*

http://www.cia.gov/cia/publications/factbook/geos/aj.html.

**2.** The Government refers to Oily Rock, together with the investors entering into the Investment Agreements, as the "investment consortium."

in emerging markets, and it effectuated its Investment Agreements with Oily Rock and Minaret during 1998, through various subsidiaries and affiliates that had been formed for the purpose of investing in Azerbaijani oil privatization vouchers and options. *See id.* ¶ 8. Between March and May of 1998, Pharos purchased $25 million in privatization vouchers and options, and wired funds to effectuate those purchases. *See id.* ¶¶ 20, 22(e).

The Government alleges that Omega and Pharos Capital Management, as well as their affiliates and subsidiaries, constitute "domestic concerns," as that term is defined in the FCPA of 1977, 15 U.S.C. § 78dd–2(h)(1)(B).[3] The Government further alleges that in his capacity as a lawyer with the Swiss law firm von Meiss Blum & Partners, Bodmer represented Omega and other entities, including Oily Rock and Minaret. As such, he was an agent of a "domestic concern." *See id.* ¶¶ 4, 6, 8, 21(1).

### C. The Bribery Conspiracy

According to the Government, beginning in August 1997, and continuing until 1999, Bodmer, in his capacity as an agent, paid bribes and authorized the payment of bribes, on behalf of various members of the investment consortium. *See id.* ¶¶ 10–15. The purpose of these payments was three-fold: "(a) to induce Azeri Officials to allow the investment consortium's continued participation in privatization; (b) to privatize SOCAR; (c) and to permit the investment consortium to acquire a controlling interest in SOCAR." *Id.* ¶ 10; *see also id.* ¶ 21(a)-(d). The bribes were paid to Azerbaijani officials, including a senior

government official, a senior SOCAR official, and two senior SPC officials, and were made in the form of cash, shares of profits from SOCAR's privatization, vouchers and options, wire transfers, and stock, among other things. *See id.* ¶¶ 9, 13, 21(e).

In connection with the bribery scheme, Bodmer allegedly participated in numerous meetings with the officials who were bribed, and created off-shore shell companies to effectuate the bribes. Furthermore, he opened Swiss bank accounts and used his law firm's client accounts at Hyposwiss Bank, where he sat on the board of directors, to launder money in furtherance of the scheme. Similarly, he wired funds through banks in Switzerland, the Netherlands, and the United Arab Emirates, and arranged for U.S. currency to be flown to Azerbaijan via private jets and charters; these funds were ultimately paid to the Azerbaijani government officials. Finally, Bodmer purportedly drafted various legal documents in connection with the payment of bribes, and arranged for the issuance of additional shares of Oily Rock, to be used as bribe payments. *See id.* ¶¶ 21(f)-(n), 22(a)-(k).

## II. LEGAL STANDARD

### A. Standard for Dismissal of an Indictment

■ Generally, a facially valid indictment returned by a duly constituted grand jury suffices to call for a trial on the merits of the charges set forth therein. *See Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). An indictment need only provide sufficient detail to protect the defendant against

---

**3.** A "domestic concern" is defined in the FCPA as,

 (A) any individual who is a citizen, national, or resident of the United States; [or]

 (B) any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole pro-

prietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States.

15 U.S.C. §§ 78dd–2(h)(1) (1977).

.

double jeopardy, and to state the elements of the charged offense to permit the preparation of a defense. *See United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998); *DeVonish v. Keane,* 19 F.3d 107, 108 (2d Cir.1994); *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992); *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975). Thus, a defendant may not challenge an indictment on the ground that it is not supported by adequate or competent evidence. *See Costello,* 350 U.S. at 363, 76 S.Ct. 406; *see also Alfonso,* 143 F.3d at 777 ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").

■■ However, a defendant may raise, by pretrial motion, any defense "that the court can determine without a trial of the general issue." Fed.R.Crim.P. 12(b). A defense meets this criteria if the trial of the general issue of guilt "would be of no assistance in determining the validity of the defense." *United States v. Covington,* 395 U.S. 57, 60–61, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969).[4] Moreover, "the court must decide every pretrial motion before trial unless it finds good cause to defer a ruling." Fed.R.Crim.P. 12(d). "Good cause" to postpone ruling on a pretrial motion exists when a defendant's claims "are substantially founded upon and intertwined with the evidence to be presented at trial." *United States v. Williams,* 644 F.2d 950, 953 (2d Cir.1981); *see also United States. v. Spero,* 331 F.3d 57, 61–62 (2d Cir.2003) ("[A]ny challenge to an indictment must be brought prior to trial because [the] mandate [of Rule 12(b)(2) ] is

no mere pleading technicality. Rather, it serves a number of important purposes, including deterrence of gamesmanship . . . and insuring that indictments are not routinely challenged (and dismissed) after the jury has been seated and sworn." (alterations original)).

**B. Rule of Lenity**

■ A criminal statute must "define the . . . offense with sufficient definiteness that ordinary people can understand what conduct is prohibited . . ." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also United States v. Roberts,* 363 F.3d 118, 122–23 (2d Cir.2004). In construing an ambiguous criminal statute, a court must adhere to the rule of lenity, which provides that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). Applying the rule "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985); *see also United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 649 (2d Cir.1993) (reversing judgment of conviction and dismissing indictment because the defendant did not have "fair warning of the sanctions the law placed on [its] conduct"); *United States v. Johnpoll,* 739 F.2d 702, 715 (2d Cir.1984) (dismissing three counts "in accordance

---

4. *Covington* involved an earlier version of Rule 12(b) of the Federal Rules of Criminal Procedure. Specifically, the Rule in effect at the time *Covington* was decided stated, "Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion." Fed.R.Crim.P. 12(b)(1) (1969). The present equivalent of the former Rule 12(b)(1) reads,

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed.R.Crim.P. 12(b)(2). Thus, although the words of the Rule have changed slightly since *Covington* was decided, the substance remains the same, and *Covington* therefore applies.

with the rule of lenity," and because they were multiplicitous).

The Supreme Court has explained the rule of lenity as one of three manifestations of the constitutional requirement that criminal statutes provide fair warning. *See United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). According to the Court,

> *First,* the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. *Second,* as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. *Third,* although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain state, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has disclosed to be within in its scope.

*Id.* (citations and quotation marks omitted). Consequently, the *Lanier* Court defined the standard for a fair notice inquiry as "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267, 117 S.Ct. 1219; *see also United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98

L.Ed. 989 (1954); *United States v. Roberts,* 363 F.3d 118, 122–23 (2d Cir.2004) (citing *Chatin v. Coombe,* 186 F.3d 82, 87 (2d Cir.1999)).

## III. DISCUSSION

Bodmer moves to dismiss both counts of the Indictment. In support of his motion, Bodmer argues that at the time of his alleged misconduct, he was not subject to the FCPA's criminal provisions, and therefore cannot be criminally sanctioned for conspiring to violate the FCPA. Bodmer further argues that both counts of the Indictment fail to allege essential elements of the charged crimes.

### A. Count I: Conspiracy to Violate The FCPA

Bodmer has been charged pursuant to the FCPA of 1977, as it existed prior to the November 10, 1998 amendments (the "1998 amendments").[5] The 1998 amendments made clear that foreign nationals acting as agents of domestic concerns are subject to the FCPA's criminal liability provisions. The question before me is whether prior to the 1998 amendments, foreign nationals who acted as agents of domestic concerns, and who were not residents of the United States, could be criminally prosecuted under the FCPA. The Government concedes that if the FCPA's criminal penalties did not apply to Bodmer, Count I must be dismissed pursuant to *Gebardi v. United States,* 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932) and *United States v. Castle,* 925 F.2d 831 (5th Cir. 1991).[6]

---

**5.** Unless otherwise specified, all references to the FCPA in this Opinion and Order are to the FCPA as it existed before the 1998 amendments. The FCPA was also amended in 1988. However, the Government contends and Bodmer does not dispute that the 1988 amendments are irrelevant to the issues raised in Bodmer's motion to dismiss. *See* Government's Memorandum of Law in Opposition to

the Defendant's Motion to Dismiss the Indictment ("Gov't Mem.") at 8 n. 1.

**6.** In *Gebardi,* the Supreme Court held that where Congress passes a substantive criminal statute that excludes a certain class of individuals from liability, the Government cannot evade Congressional intent by charging those individuals with conspiring to violate the same statute. *See Gebardi,* 287 U.S. at 121–

According to the Government, before the 1998 amendments, the FCPA's criminal penalties applied to non-resident foreign nationals who had "minimum contacts" with the United States. *See* Gov't Mem. at 18. Bodmer contends that the statute's criminal penalties did not apply to non-resident foreign nationals who acted only as agents of a domestic concern. *See* Memorandum of Law in Support of Dr. Bodmer's Motion to Dismiss the Indictment ("Def. Mem") at 6–14. Alternatively, he argues that before the 1998 amendments, the scope of the FCPA's criminal penalties was ambiguous, but that at a minimum, the penalties applied only to non-resident foreign nationals whose status in the United States was similar to that of a citizen, national, or resident. *See* Reply Memorandum in Support of Dr. Bodmer's Motion to Dismiss the Indictment ("Reply Mem.") at 11–12, 16–17.[7]

### 1. The Statutory Language and Canons of Construction

■ "[I] begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *see also Rewis*, 401 U.S. at 812, 91 S.Ct. 1056 (considering first the statutory language, and then the legislative history, to determine the scope of a criminal statute); *Liparota*, 471 U.S. at 424, 105 S.Ct. 2084 (same). The penalty provision of the FCPA states, in pertinent part, as follows:

(A) *Any officer or director of a domestic concern, or stockholder acting on behalf of such domestic concern,* who willfully violates subsection (a) of this section shall be fined not more than $100,000 or imprisoned not more than 5 years, or both.

(B) Any employee or *agent of a domestic concern who is a United States citizen, national, or resident or is otherwise subject to the jurisdiction of the United States* (other than an officer, director, or stockholder acting on behalf of such domestic concern), and who willfully violates subsection (a) of this section, shall be fined not more than $100,000 or imprisoned not more than 5 years, or both.

(C) *Any officer, director, employee, or agent of a domestic concern, or stockholder acting on behalf of such domestic concern,* who violates subsection (a) of this section shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Attorney General.

15 U.S.C. § 78dd–2(g)(2) (1997) (emphases added). It is clear from this language that any *officer or director* of a domestic concern, regardless of citizenship, nationality, and residency, is subject to criminal penal-

23, 53 S.Ct. 35. In *Castle*, the Fifth Circuit applied the *Gebardi* principle to the FCPA, holding that foreign officials who are expressly exempt from substantive charges under the FCPA cannot be charged with conspiracy to violate the FCPA. *See Castle*, 925 F.2d at 836.

7. In support of his Reply Memorandum, Bodmer submitted the Declaration of Professor Harry First ("First Decl."). *See* Ex. 1 to Reply Mem. Professor First declares that Bodmer's interpretation of the FCPA "provides a more persuasive interpretation of the FCPA's reach to foreign nationals than does the government." First Decl. ¶ 4. Because expert opinions on purely legal questions of American law are not admissible for any purpose, Professor First's declaration is hereby stricken. *See In re Initial Public Offering Sec. Litig.*, 174 F.Supp.2d 61, 63 (S.D.N.Y.2001) ("The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" (quoting Thomas Baker, *The Impropriety of Expert Witness Testimony on the Law*, 40 U. Kan. L.Rev. 325, 352 (1992))).

ty. *See* 15 U.S.C. § 78dd–2(g)(2)(A). Similarly, all directors, employees, agents, and stockholders acting on behalf of a domestic concern are subject to *civil* penalty, regardless of citizenship, nationality, and residency. *See* 15 U.S.C. § 78dd–2(g)(2)(C). However, it is not clear whether *agents* of domestic concerns who are neither United States citizens, nationals, nor residents, may be subject to the FCPA's criminal penalties. Pursuant to the language of the statute, such persons are subject to criminal penalty *only* if they are "otherwise subject to the jurisdiction of the United States." 15 U.S.C. § 78dd–2(g)(2)(B).

■ The FCPA does not define "otherwise subject to the jurisdiction of the United States." Where no definition is provided, courts first "consider the ' ordinary, common-sense meaning of the words." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir.2000). But this canon of statutory construction provides little guidance here, because the phrase "otherwise subject to the jurisdiction of the United States" does not have an "ordinary common-sense meaning." Instead, it is a technical legal term, with varying meanings in different contexts. For example, the Supreme Court has said that in civil cases, a defendant is subject to a state's jurisdiction where the defendant has had "minimum contacts" with that state.[8] *See Burger King v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) statutory scheme, on the other hand, Congress has defined the phrase

"otherwise subject to the jurisdiction of the United States" to mean "subject to the jurisdiction of the United States by virtue of United States citizenship, United States vessel documentation or numbering, or as provided by international agreement to which the United States is a party." 42 U.S.C. § 9601(19). These widely varying definitions demonstrate that there is no "ordinary, common-sense meaning" of the phrase "otherwise subject to the jurisdiction of the United States." For this reason, I cannot rely on the meaning of "otherwise subject to the jurisdiction of the United States," as it is used in some other statute or context: judicial interpretations of a statute's reach must be based on Congress's intent in enacting the statute at issue. *See North South Finance Corp. v. Al–Turki*, 100 F.3d 1046, 1052 (2d Cir. 1996) (refusing to employ rules for extraterritorial application of securities and antitrust laws in the RICO context).

Other cannons of statutory construction are similarly unhelpful. The "central tenet of interpretation, that a statute is to be considered in all its parts when construing any one of them," *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998), provides no guidance. Specifically, it is clear from the statute that Congress did not distinguish between officers, directors, employees, and agents with respect to *civil* penalties. *See* 15 U.S.C. § 78dd–2(g)(2)(C). Moreover, in imposing criminal penalties, Congress intended to treat officers and directors differently than agents and employees, and was concerned about criminally sanctioning agents who are neither United States citizens, nation-

---

**8.** The Government urges the Court to conclude that the FCPA applies to Bodmer if he had "minimum contacts" with the United States. *See* Gov't Mem. at 18 ("When we speak of jurisdiction in the criminal law, we ordinarily mean the assertion of personal jurisdiction where there are sufficient minimum contacts with the United States to satisfy Constitutional due process concerns." (quotation marks omitted)). I discuss this argument, and the technical meaning of "jurisdiction," more fully below. *See infra,* Parts III.A.3–4.

als, nor residents. But this statutory structure does not elucidate the circumstances under which non-resident foreign nationals acting as agents may be subject to criminal penalty, because it does not clarify what it means to be an "employee or agent" that is "otherwise subject to the jurisdiction of the United States."

Bodmer places considerable reliance on the rule of *ejusdem generis*: "where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." *Dauray* 215 F.3d at 262. As an initial matter, I am not persuaded that the phrase "otherwise subject to the jurisdiction of the United States" constitutes a "general phrase" following a "specific enumeration of persons or things." But even assuming that it does, the rule of *ejusdem generis* merely suggests that the phrase "otherwise subject to the jurisdiction of the United States" means something similar to "a United States citizen, national, or resident." Yet, this canon simply creates another question: What does it mean to be "similar" to a citizen, national, or resident?

Finally, the Government places great weight on the maxim that "a statute must, if possible be construed in such a fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). But this rule does little more than demand that the phrase "otherwise subject to the jurisdiction of the United States" be given *some* meaning other than citizen, national, or resident; it does not shed any light on what that meaning is. In sum, the language of the FCPA, and the canons of statutory construction, do not clarify whether the FCPA's criminal penalties apply to Bodmer.

## 2. Legislative History

■ "When the plain language and canons of statutory interpretation fail to resolve statutory ambiguity, [courts] [ ] resort to legislative history." *Dauray* 215 F.3d at 264. The FCPA's legislative history is comprised of Congressional reports from both the passage of the statute in 1977, and the 1998 amendments.

### a. The 1977 Conference Report

The Senate and House bills proposing the FCPA dealt not only with bribes to foreign officials, but also with various amendments to the Securities and Exchange Act of 1934. As a result, although there are both House and Senate reports for the legislation that ultimately became the FCPA, those reports deal, in large part, with amendments to the securities laws and the justifications for prohibiting improper payments to foreign officials; the penalties for violating the FCPA, and the scope of those penalties, are not discussed. Thus, a review of the FCPA's legislative history provides little insight into the meaning of "otherwise subject to the jurisdiction of the United States." 15 U.S.C. § 78dd–2(g)(2)(B). According to the Conference Report,

the conferees recognized the inherent jurisdictional, enforcement, and diplomatic difficulties raised by the inclusion of foreign subsidiaries of U.S. companies in the direct prohibitions of the bill.... The conferees recognized that such jurisdictional enforcement, and diplomatic difficulties may not be present in the case of individuals who are U.S. Citizens, nationals, or residents.... In addition, the conferees determined that foreign nationals or residents otherwise under the jurisdiction of the United States would be covered by the bill in circumstances where an issuer or do-

mestic concern engaged in conduct proscribed by the bill.

H.R. Conf. Rep. No. 95–831, at 14 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4120, 4126. But the Conference Report provides no explanation for what it means to be a "foreign national[ ] or resident[ ] otherwise under the jurisdiction of the United States." And the Senate Report does not discuss at all the application of the FCPA's criminal penalties to non-resident foreign nationals. *See* S.Rep. No. 95–114 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4098. Therefore, the 1977 legislative history is not instructive in determining the meaning of "otherwise subject to the jurisdiction of the United States," as it is used in section 78dd–2(g)(2)(B) of the FCPA, and provides no guidance regarding Congress's original intent in applying the FCPA to non-resident foreign nationals who serve as agents of domestic concerns.

### b. The 1998 Amendments

■ On November 10, 1998, President Clinton signed the International Anti–Bribery and Fair Competition Act of 1998, which

> amend[ed] the FCPA to eliminate the current disparity in penalties applicable to U.S. nationals and foreign nationals employed by or acting as agents of U.S. companies. *In the current statute, foreign nationals employed by or acting as agents of U.S. companies are subject*

*only to civil penalties.* The Act eliminates this restriction and subjects all employees or agents of U.S. businesses to both civil and criminal penalties.[9]

S.Rep. No. 105–277 at 3 (1998); H.R.Rep. No. 105–802 at 20 (1998) (emphasis added). It is clear, then, that at the time of the 1998 amendments, Congress did not believe that the FCPA subjected non-resident foreign nationals who acted as agents of domestic concerns to criminal penalties. This is of particular importance because "a statute should be construed to be consistent with subsequent statutory amendments." *Dauray,* 215 F.3d at 263 (citing *Bowen v. Yuckert,* 482 U.S. 137, 149–51, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). "And while the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight, and particularly so when the precise intent of the enacting Congress is obscure." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980) (citations omitted).

The Government urges the Court to ignore the 1998 amendments, arguing that the Supreme Court has "warn[ed] that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Prod. Safety Comm'n,* 447 U.S. at 117, 100 S.Ct. 2051 (citations and quotation marks omitted); *see also Central Bank of Denver v. First*

---

9. As revised by the 1998 amendments, the pertinent portions of the FCPA penalty provision now read,

(A) *Any natural person that is an officer, director, employee, or agent of a domestic concern,* or stockholder acting on behalf of such domestic concern, who willfully violates subsection (a) or (i) of this section shall be fined not more than $100,000 or imprisoned not more than 5 years, or both.
(B) *Any natural person that is an officer, director, employee, or agent of a domestic concern,* or stockholder acting on behalf of such domestic concern, who violates sub-

section (a) or (i) of this section shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Attorney General.

15 U.S.C. § 78dd–2(g)(2) (2004) (emphases added). The 1998 amendments thus eliminated the original distinction, for purposes of criminal penalties, between officers and directors, on the one hand, and agents and employees, on the other hand. As revised, the FCPA treats officers, directors, agents and employees the same, regardless of citizenship, nationality, and residency.

*Interstate Bank of Denver,* 511 U.S. 164, 185, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("[W]e have observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute." (quotation marks omitted)). Though I am cognizant of the Supreme Court's warnings in these cases, the 1998 amendments cannot be completely ignored because as discussed earlier, Congress's intent with respect to the criminal penalties of the FCPA of 1977, as reflected in the statutory language and legislative history, is entirely obscure. *See Seatrain Shipbuilding Corp.,* 444 U.S. at 596, 100 S.Ct. 800.

Moreover, I note that on May 4, 1998, Ann M. Harkins, Acting Assistant Attorney General, submitted letters on behalf of the Department of Justice to Newt Gingrich, Speaker of the House, and Vice–President Al Gore, in support of the 1998 amendments. In those letters, the Department of Justice explained that the 1998 amendments,

> would amend the penalties applicable to employees and agents of U.S. businesses to eliminate the current disparity between U.S. nationals and non-U.S. nationals employed by or acting as agents of U.S. companies. *In the current statute, such non-U.S. nationals are subject only to civil penalties.* The bill would eliminate this restriction and subject all employees or agents of U.S. businesses to both civil and criminal penalties.

Letters from Ann M. Harkins, Acting Assistant Attorney General, to Al Gore and Newt Gingrich (May 4, 1998), http://www.usdoj.gov/criminal/fraud/fcpa/tranlet.htm (emphasis added). Thus, it is not only a subsequent Congress that believed that before the 1998 amendments, the FCPA's criminal penalties did not apply to non-resident for-eign nationals who acted as agents of a domestic concern; the Government held the same belief.

In sum, the legislative history of the FCPA's enactment sheds no light on whether Congress intended to include within the statute's criminal penalties non-resident foreign nationals who act as agents of a domestic concern. The legislative history for the 1998 amendments, as well as the Department of Justice's own pronouncements, suggest that until after the 1998 amendments, the criminal sanctions did not apply to foreign nationals who act as agents of domestic concerns, unless they were found in the United States. Such a conclusion is consistent with the precept that "Congress is primarily concerned with domestic conditions." *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (citation omitted).

### 3. Judicial Interpretations

Because both the statutory language and the legislative history are ambiguous, I will now consider judicial interpretations of the FCPA. If other courts have construed the FCPA's criminal penalties, prior to the 1998 amendments, to apply to non-resident foreign nationals, Bodmer was on notice that his alleged conduct could subject him to criminal sanctions. *See Lanier,* 520 U.S. at 266, 117 S.Ct. 1219.

No court has ever before considered whether prior to the 1998 amendments, non-resident foreign nationals who acted as agents of domestic concerns were subject to the FCPA's criminal penalties. In fact, other than Bodmer, it appears that the Department of Justice has charged only one such person under the FCPA. In 1990, an information was filed against George Morton, a Canadian national, as a result of his role in a scheme to bribe Canadian officials. But Morton pled guilty

without challenging the applicability of the FCPA, and therefore no court ever considered whether the FCPA's criminal penalties applied to him.[10] *See* Gov't Mem. at 23 n. 7.

Only one other court has even considered whether prior to the 1998 amendments, the FCPA's prohibitions (as opposed to penalties) applied to foreign nationals at all. In *Dooley v. United Technologies Corp.*, 803 F.Supp. 428 (D.D.C.1992), the district court for the District of Columbia concluded, in a civil action, that the FCPA extended to foreign individuals where the court had *personal jurisdiction* over those individuals based on their contacts with the forum. This conclusion was based on the statutory language and legislative history of the FCPA. *See id.* at 440. The Government urges this Court to extend the *Dooley* court's conclusion, and find that the FCPA's criminal penalties apply to Bodmer if he had minimum contacts with the United States.

*Dooley* was a civil RICO action where the plaintiff alleged violations of the FCPA as predicate acts. Thus, *Dooley* dealt only with the contours of *civil* liability stemming from the FCPA, and did not consider whether a non-resident foreign national may be subject to *criminal* penalty for violating the FCPA.[11] Because the *Dooley* court was not faced with the possibility of a defendant being charged, convicted, and sentenced for conduct that he could not have known was prohibited and criminally sanctionable, its holding is not instructive.[12]

## 4. The FCPA's Criminal Penalties Apply to Foreign Nationals Who Appear in a United States Court

After consideration of the statutory language, legislative history, and judicial interpretations of the FCPA, the jurisdictional scope of the statute's criminal penalties is still unclear. The question remains: What does it mean for an agent of a domestic concern to be "otherwise subject to the jurisdiction of the United States"? This confusion likely results from the fact that the concept of "jurisdiction" does not generally arise in the criminal context. Instead, jurisdiction is reserved for civil cases—a *civil* defendant may avoid *civil* prosecution if the court lacks jurisdiction over her. As any first-year law student knows, the question of whether a court has jurisdiction over a civil defendant is governed by the forum state's laws, but at the very least, due process requires that the defendant have "minimum contacts" with the state.[13] *See*

---

**10.** The Government's charging decision, standing alone, does not establish the applicability of the statute. I also note that the 1990 charge against Morton is somewhat mystifying given that in May 1998 (before the 1998 amendments), the Department of Justice took the position that the FCPA's criminal penalties did not apply to foreign nationals. *See supra,* Part II.A.2.

**11.** There is no doubt that prior to the 1998 amendments, non-resident foreign nationals were subject to the FCPA's civil penalties, in actions brought by the Attorney General. *See* 15 U.S.C. § 78dd–2(g)(2)(C) (1997). Thus, the *Dooley* court's conclusion that non-resident foreign nationals may also be subject to

liability through private civil RICO actions predicated on FCPA violations is arguably a natural extension of the statute's language.

**12.** Because *Dooley* is inapplicable to the case before me, I reach no conclusion as to whether its holding, and interpretation of the legislative history, is correct.

**13.** Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the defense of "lack of jurisdiction over the person" must be asserted in the first responsive pleading, or it is waived. *See* Fed. R. Civ. Pro. 12(b)(2). The Federal Rules of Criminal Procedure allow a criminal defendant to challenge the court's subject matter jurisdiction at any time, but do

*Burger King,* 471 U.S. at 474, 105 S.Ct. 2174; *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154.

But the issue of "minimum contacts" does not arise in criminal cases. If a defendant appears in court to defend charges, the court may inquire into whether *venue* is proper. This is because the Constitution provides that "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, and "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. *See also United States v. Rodriguez–Moreno,* 526 U.S. 275, 278, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999); *United States v. Geibel,* 369 F.3d 682, 696 (2d Cir.2004) ("Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." (quotation marks and citations omitted)). If venue is proper, the court does not inquire into whether it has jurisdiction over the defendant, or the extent of the defendant's contacts with the forum state. Jurisdiction is presumed by virtue of the defendant's presence. *See Ker v. Illinois,* 119 U.S. 436, 440–43, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *United States v. Rosenberg,* 195 F.2d 583, 602 (2d Cir.1952) ("[T]he court in a criminal case, unlike a civil case, would still have jurisdiction over [a criminal defendant's] person, as long as he was physically present at the trial." (citing cases)).

With this in mind, the criminal penalty provision of the FCPA of 1977 appears to implicate the concept of personal jurisdic-

tion as articulated in *Ker* and *Rosenberg.* *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken ..."); *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Res.,* 532 U.S. 598, 615, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) ("Words that have acquired a specialized meaning in the legal context must be accorded their legal meaning."). I therefore conclude that in 1977, Congress likely intended that the FCPA's criminal sanctions applied to non-resident foreign nationals who properly appeared in United States courts; personal jurisdiction over the defendant derived from the defendant's (1) arrest in the United States, (2) voluntary appearance in court, or (3) lawful extradition.

Of course, as *Ker* and *Rosenberg* make clear, personal jurisdiction exists in all criminal cases where the defendant is lawfully before the court. As such, Congress's inclusion of the phrase "otherwise subject to the jurisdiction of the United States" in the FCPA's criminal penalties was superfluous because jurisdiction over the defendant is a prerequisite to any criminal action—in no case may the Government seek to sanction an individual or entity over whom it has no jurisdiction. Thus, it appears that the 1998 amendments eliminated any possible ambiguity in the FCPA's penalties caused by Congress's inclusion of a wholly unnecessary clause, and clarified that the FCPA's criminal penalties apply to any natural person

not speak to jurisdiction over the defendant. *See* Fed. R.Crim. Pro. 12(b)(3) ("[A]t any time while the case is pending, the court may hear

a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense[.]").

who is subject to the jurisdiction of the United States courts. *See* 15 U.S.C. § 78dd–2(g)(2) (2004).

### 5. The Rule of Lenity Requires Dismissal of Count I

■■■ Although Bodmer purportedly appeared in this Court voluntarily, thereby triggering jurisdiction over him, the circumstances of his extradition, as well as the rule of lenity, nonetheless require dismissal of Count I.

The Indictment was filed under seal on August 5, 2003, while Bodmer was in Switzerland.[14] Several days later, Bodmer traveled to South Korea on behalf of the International University Sports Federation. *See* Def. Mem. at 1 n. 1. Thereafter, the Indictment was unsealed, and on August 19, 2003, Bodmer was arrested in South Korea. *See id.* In the ensuing five months, Bodmer was incarcerated in a South Korean prison, and because of local prison rules, he was not permitted to meet with his United States counsel to discuss his case. He ultimately consented to extradition from South Korea to the United States, arriving here on January 16, 2004. *See* Bodmer's Petition for Pretrial Release at 1–2.

Given the circumstances of Bodmer's arrest, incarceration in South Korea, and extradition to the United States, I have serious doubts regarding whether his extradition, and appearance in this Court, were truly consensual. Bodmer was in an untenable position in South Korea: he could remain in prison indefinitely, unable to meet with United States counsel, or he could consent to extradition. Though theoretically Bodmer could have contested extradition while incarcerated in South Korea, this alternative was illusory because of his lack of access to U.S. counsel. In sum,

although Bodmer technically consented to extradition, I conclude that because of the circumstances surrounding his arrest and extradition, his appearance in this Court was, as a practical matter, involuntary.

Moreover, even if Bodmer consented to personal jurisdiction by appearing in court, he did not have fair notice that the FCPA's criminal sanctions applied to him, or that his appearance in court triggered the statutory criminal penalty. As discussed above, the language contained in the penalty provisions of the FCPA is ambiguous, and there is no legislative history establishing that Congress intended to subject non-resident foreign nationals who act as agents of domestic concerns to criminal penalties. Neither the statute standing alone, nor any judicial interpretation, made it reasonably clear to Bodmer that his alleged conduct, or his voluntary appearance in a United States court, could result in a criminal penalty. *See Lanier,* 520 U.S. at 267, 117 S.Ct. 1219; *Plaza Health Labs.,* 3 F.3d at 649. In fact, it appears that as of 1998, even the Department of Justice did not believe the FCPA's criminal penalties could be applied to a non-resident foreign nationals. *See supra,* Part III.A.2. Accordingly, the portion of the indictment charging Bodmer with conspiracy to violate the FCPA contravenes the constitutional fair notice requirement, and the rule of lenity demands its dismissal.

### B. Count II: Conspiracy to Launder Money

Bodmer makes two arguments in support of his motion to dismiss Count II, charging him with conspiracy to launder money in violation of section 1956 of Title 18. *First,* Bodmer argues that pursuant

---

14. Notably, Bodmer could not have been extradited from Switzerland because the Swiss government does not extradite Swiss nationals. *See United States v. Bodmer,* No. 03 Cr. 947, 2004 WL 169790, at *2 (S.D.N.Y. Jan.28, 2004).

to the *Gebardi* principle, he cannot be guilty of conspiring to launder money in furtherance of unlawful activity—a violation of the FCPA—where he cannot be guilty of the underlying unlawful activity. *See* Def. Mem. at 16. *Second,* he argues that Count II is fatally flawed because it fails to allege essential elements of the crime charged.

### 1. The *Gebardi* Principle Does Not Apply to Count II

 As noted above, the Government concedes that pursuant to *Gebardi,* if the FCPA's criminal penalties do not apply to Bodmer, then the Government cannot circumvent that limitation by charging Bodmer with conspiracy to violate the FCPA. *See* Gov't Mem. at 30. Bodmer seeks to extend the *Gebardi* principle to Count II, arguing that because the FCPA does not apply to him, he also cannot be sanctioned for conspiring to launder money in furtherance of FCPA violations.[15] Specifically, according to Bodmer, "[t]he *Gebardi* principle prevents the government from undermining Congressional intent by charging an individual, whom Congress has purposefully excluded from an underlying statute, with a separate offense premised on the underlying statute." Reply Mem. at 18; *see also* Def. Mem. at 16–17. This argument is misplaced.

As an initial matter, Bodmer's claim that he is "excluded" from the FCPA is inaccurate. Even before the 1998 amendments, the FCPA prohibited *all* officers, directors, agents, and employees of domestic concerns from making improper payments to foreign officials. *See* 15 U.S.C. § 78dd–2(a) (1997). I have concluded that prior to the 1998 amendments, there was ambiguity concerning whether non-resident foreign nationals who engaged in such conduct as agents of a domestic concern were subject

to criminal penalty. *See supra,* Part III. A.4. Nonetheless, the FCPA prohibited Bodmer's alleged conduct, and subjected him to civil penalty. Thus, Bodmer's claim that Congress intentionally "excluded" him from the FCPA is inaccurate; only the criminal penalties contained in the FCPA do not apply to him.

Of course, the fact that the FCPA's civil penalties may apply to Bodmer does not alter his *Gebardi* argument: if he cannot be criminally sanctioned for violating the FCPA, the Government cannot circumvent this limitation by charging him under a different statute for precisely the same conduct. The question, then, is whether Bodmer may be criminally penalized for laundering money in furtherance of FCPA violations, even if he cannot be sanctioned for the violations themselves.

The money laundering statute upon which Count II is based prohibits the

> transport[ation], transmi[ssion], or transfer[ ], or attempt[ ] to transport, transmit, or transfer [of] a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States *with the intent to promote* the carrying on of a specified unlawful activity[.]

> \* \* \* \* \* \*

> There is extraterritorial jurisdiction over the conduct prohibited by this section if (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

---

**15.** Notably, Bodmer cites no case law in support of this argument. No court has ever applied the *Gebardi* principle to dismiss a charge of conspiracy to launder money.

18 U.S.C. § 1956(a)(2)(A) and (f) (emphasis added). The language of the statute clearly penalizes the *transportation of monetary instruments in promotion* of unlawful activity, not the underlying unlawful activity; in passing the money laundering statute, Congress determined that the transportation of monetary instruments in promotion of unlawful activity itself constitutes a crime.

 The elements of a money laundering offense do not include, or even implicate, the capacity to commit the underlying unlawful activity. *See United States v. Cruz*, 993 F.2d 164, 167 (8th Cir.1993) ("For the government to prove a violation of section 1956(a)(1)(A)(i), the evidence must establish (1) that the defendant conducted a financial transaction which involved the proceeds of unlawful activity; (2) that he knew that the property involved in the transaction was proceeds of some form of specified unlawful activity; and (3) that he intended to promote the . . . unlawful activity." (quotation marks and alterations omitted)). Whether Bodmer violated the FCPA, and the fact that he cannot be criminally sanctioned for that conduct, is irrelevant to proving that he transported money in furtherance of FCPA violations. Thus, the Government is not circumventing the FCPA's limitation on penalizing non-resident foreign nationals by charging Bodmer with money laundering.

The logic of this result is inexorable. If immunity from the FCPA's criminal penalties automatically conferred non-resident foreign nationals with immunity from the money laundering statute, these non-resident foreign nationals could openly serve as professional money launderers of proceeds derived from violations of the FCPA,

without repercussion. United States citizens and entities could hire non-resident foreign nationals to launder money derived from FCPA violations, and the launderers would be beyond the reach of the Department of Justice even if part of the conduct occurred in the United States. This would contravene Congress's clearly articulated intention to include foreigners within the scope of the money laundering statute. *See* 18 U.S.C. § 1956(f) (providing extraterritorial jurisdiction over non-United States citizens who violate the money laundering statute *if* part of the transactions occur in the United States and involve funds or monetary instruments exceeding a value of $10,000).

## 2. The Indictment Adequately Alleges the Elements of Conspiracy to Launder Money

Bodmer argues that Count II must be dismissed because the Government has failed to allege [16] that Bodmer (1) "knew that his conduct was unlawful under the FCPA—*i.e.*, that he acted 'willfully' in furtherance of that conspiratorial object," and (2) was "actually acting as an authorized agent for a domestic concern when he entered into the alleged conspirac[y]" to launder money. Def. Mem. at 20–21.

In support of his argument that Count II fails to allege that Bodmer knew his conduct violated the FCPA, Bodmer cites *United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), for the proposition that the "Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *See also United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir.2003) ("Where the conspiracy involves a specific-intent

---

**16.** Bodmer also argues that Count I should be dismissed because it fails to allege essential elements of a conspiracy to violate the FCPA. However, because I conclude that Count I must be dismissed pursuant to the rule of lenity, I do not consider whether the Government adequately alleged the elements of conspiring to violate the FCPA.

crime, the government must establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." (quotation marks and alterations omitted)).

■ The substantive offense underlying Count II is a violation of the money laundering statute, not the FCPA. Therefore, the Government need only prove that Bodmer had the degree of criminal intent necessary to sustain a conviction under the money laundering statute; it need not prove that Bodmer intended to violate the FCPA. Moreover, *Feola* and *Ceballos* speak to the Government's burden in *proving* a conspiracy, not *pleading* a conspiracy.

■ In Count II, the Government alleges that Bodmer and others,

unlawfully, *wilfully, and knowingly* did combine, conspire, confederate and agree together and with each other to [launder money, in violation of] section 1956(a)(2) of Title 18, United States Code. It was a part and an object of the money laundering conspiracy that HANS BODMER ... unlawfully, *wilfully, and knowingly* would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument from a place in the United States to and through a place outside the United States, *with the intent* to promote the carrying on of specified unlawful activity, to wit, felony violations of the Foreign Corrupt Practices Act[.]

Indictment ¶¶ 24–25 (emphases added). Clearly, the Government has adequately alleged not only that Bodmer wilfully and knowingly entered into a conspiracy, but also that he had the specific intent to violate the money laundering statute, the substantive statute underlying the conspiracy charge. These allegations sufficiently provide Bodmer with a "plain, concise and definite written statement of the essential facts constituting the offense charged" in Count II. Fed.R.Crim.P. 7(c)(1); *see also Alfonso,* 143 F.3d at 776; *DeVonish,* 19 F.3d at 108; *Stavroulakis,* 952 F.2d at 693; *Tramunti,* 513 F.2d at 1113. This is particularly true when the allegations are viewed together with the extensive description of Bodmer's purported activities contained in the "General Allegations" section of the Indictment. *See* Indictment ¶¶ 1–22.

Finally, Bodmer's claim that the Indictment fails to allege that he was acting as an agent of a domestic concern when he entered into the conspiracy to launder money is disingenuous. The Indictment specifically alleges that,

*At all times relevant to this Indictment,* HANS BODMER, the defendant, was a Swiss Citizen and a lawyer with the Swiss law Firm von Meiss Blum & Partners. Bodmer represented Oily Rock, Minaret, Omega Advisors, Inc. [ ] and various other investors in connection with their investment in Azer[baijani] privatization vouchers and options with Oily Rock and Minaret.... As the *lawyer and agent of Omega Advisors, Inc. and various other members of the investment consortium, Bodmer was an agent of a 'domestic concern,'* as that term is defined in the [FCPA].

Indictment ¶ 6 (emphases added). The money laundering conspiracy count incorporates this allegation that during all times relevant to the Indictment, Bodmer acted as an agent of a domestic concern. *See id.* ¶ 23. Therefore, the Government has sufficiently pled that at the time Bodmer entered into the conspiracy to launder money, he was acting as an agent of a domestic concern. Bodmer's motion to dismiss Count II is denied.

## IV. CONCLUSION

For the foregoing reasons, Bodmer's motion to dismiss the Indictment is grant-

ed in part and denied in part. The motion is granted with respect to Count I, and denied with respect to Count II. The Clerk of the Court is directed to close this motion [docket # 13]. A conference is scheduled for July 27, 2004 at 4:30 p.m.

SO ORDERED.